# United States Court of Appeals
## For the First Circuit

No. 07-1462

UNITED STATES OF AMERICA,

Appellee,

v.

ANDREW LEWIS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Boudin, Wallace* and Howard,
Circuit Judges.

Christopher Goddu for appellant.
Kelly Begg Lawrence, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief for appellee.

February 2, 2009

*Of the Ninth Circuit, sitting by designation.

**HOWARD, Circuit Judge**. A jury convicted Andrew Lewis of one count of receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2), in connection with ten videos found on his home computer. Lewis now argues that the evidence was insufficient to convict him, pointing in particular to the "interstate commerce" element of the crime and claiming that the government presented no evidence to satisfy this element. Ultimately, two of our prior cases, United States v. Carroll, 105 F.3d 740 (1st Cir. 1997) and United States v. Hilton, 257 F.3d 50 (1st Cir. 2001), lead us to reject Lewis' argument. Accordingly, we affirm.

## I. Facts

Andrew Lewis came to the attention of federal law enforcement in connection with some "inappropriate" images discovered on a computer on the grounds of the Salem Maritime National Historic Site, where Lewis worked as a United States Park Ranger.[1] He was later indicted for receipt of child pornography in connection with other videos he admitted downloading to his computer at home.

Forensic analysis of Lewis's home computer revealed that the videos had likely been downloaded using Lewis's Comcast Internet connection and a peer-to-peer file-sharing application

---

[1] These images and the computers at the National Historic Site form no part of the basis for the indictment, and they were not introduced or referred to at trial. We mention them merely to explain the genesis of the investigation that yielded the videos.

called LimeWire. The government presented expert testimony about Lewis's computer and the software; the expert witness conceded on cross-examination that it is possible a given file transfer made using LimeWire might have been conducted entirely within the borders of one state.

The government sought, and Lewis objected to, a jury instruction that stated, "If you find that the video images were transmitted or received over the Internet, that is sufficient to find that the images moved or traveled in interstate or foreign commerce." The district court agreed with the government and gave a substantially similar instruction: "An image has been shipped or transported in interstate commerce if it has been transmitted over the Internet." Lewis objected both before and after the instruction was given.

The jury asked one question of the district court during its deliberations: "If a file is transported exclusively within a single state on the Internet, is that considered interstate commerce?" After consultation, and over further objection by Lewis, the district court answered the question in the affirmative. A little more than one hour later, the jury returned its guilty verdict.

## A. Background

To place the issue in context, we present some background about the Internet and LimeWire. The government's expert testified

to much of this information.  We refer to the fact-finding of other courts for the rest.

## 1. The Internet

"The Internet is an international network of interconnected computers."  Reno v. ACLU, 521 U.S. 844, 849 (1997). Internet communication relies on TCP/IP,[2] "a set of standard operating and transmission protocols that structure the Internet's operation."  In re Doubleclick Privacy Litigation, 154 F. Supp. 2d 497, 501 (S.D.N.Y. 2001).  Any message or file to be transmitted is broken into smaller pieces, called packets.  "Each packet contains the Internet Protocol ('IP') address of the destination . . . , a small portion of data from the original document, and an indication of the data's place in the original document."  Id.  The packets are routed along the web-like network of interconnected computers. "Not all packets from the same transmission necessarily follow the same path."  Sightsound.com, Inc., 185 F. Supp. 2d at 461.  Along the way, computers called routers determine the shortest-in-time route for each packet from source to destination.  Each packet therefore takes a stepping-stone path through the network of connected computers, subject to re-routing along the way if there

___

[2]    TCP/IP stands for "Transmission Control Protocol / Internet Protocol."  Resonate, Inc. v. Alteon Websystems, Inc., 338 F.3d 1360, 1362 n.1 (Fed. Cir. 2003).  Transmission Control Protocol governs the disassembly of a file into packets as well as the re-assembly of packets into a file;  Internet Protocol governs the routing of those packets from the source computer to their destination.  Sightsound.com, Inc. v. N2K, Inc., 185 F. Supp. 2d 445, 461 (W.D. Pa. 2002).

is congestion, an outage, or any other error in any part of the path.

At the destination computer, the packets are re-assembled according to instructions they contain into the original file or message. If any packets are missing, the destination computer may request they be re-sent from the source computer. Doubleclick Privacy Litigation, 154 F. Supp. 2d at 502. All of this can now occur fast enough to enable a viewer to watch live video from the other side of the planet. "Dynamic routing," as the process is known, makes the Internet extraordinarily robust, because the path between two computers is able to adapt to changing conditions on the network and thereby avoid areas of outage, congestion or other problems. Dynamic routing, however, also obscures the exact path a piece of data would likely take, or have taken, from one computer to another. For the purposes of determining whether a transmission has taken place across state lines, this difficulty is compounded because transmission along any single "segment" of wire or fiber-optic cable is so fast that the actual distance of the packet's journey is much less important in computing the total travel time than are network congestion, the number of "hops" the packet takes and other factors. Simply put, it is impossible to say with any certainty that a given packet will take the shortest route in distance; the routers search for the shortest route in time. Further compounding this problem, the network itself was not

established with state boundaries in mind, nor does it even recognize them. "The Internet is wholly insensitive to geographic distinctions." Am. Libraries Ass'n v. Pataki, 969 F. Supp. 160, 170 (S.D.N.Y. 1997).

### 2. LimeWire

LimeWire is a peer-to-peer file sharing application that connects users who wish to share data files with one another.[3] Although the Supreme Court has defined "peer-to-peer" networks as those in which "users' computers communicate directly with each other, not through central servers," Grokster, 545 U.S. at 919-20, in this context such a description may be misleading. While a central server is not needed to coordinate file transfers made through LimeWire, the transfer is still subject to the dynamic routing associated with the underlying TCP/IP protocol. This means that the so-called "direct connection" is still mediated by whatever stops each of the packets might make on its journey from source to destination.

LimeWire and the Gnutella network are indifferent to the nature of the data -- images or text or music or video or software.

---

[3] LimeWire is also the name sometimes used for the collection of computers running the application LimeWire and for the central Web site where the LimeWire application can be downloaded for free. It is also sometimes used to describe the protocol by which that network operates, although the protocol is properly known as the "Gnutella" network. This network is the one used by the Streamcast software at issue in MGM Studios v. Grokster, Ltd., 545 U.S. 913, 921 (2005). We use "LimeWire" to refer to the software application.

They are equally indifferent to the legal status of the data --
public-domain or copyrighted or contraband.

LimeWire combines two functions: the ability to search
for and download files from other users, and the ability to make
files on one's own computer available to other users.  A brief
sketch of the mechanics of these functions will frame the evidence
presented at Lewis's trial.

### a. Sharing One's Own Files

When it is first installed, LimeWire creates a folder
named "Shared" on the user's computer.  By default, any file placed
in that "Shared" folder is available to anyone else on the Internet
who uses the LimeWire application.  Also by default, any file a
user downloads through LimeWire is automatically placed in that
"Shared" folder and is therefore offered by that user for further
downloads by other users.  These default behaviors can be changed
by the user:  a user could turn off sharing altogether, designate
another folder with a different name to serve as the "Shared"
folder, manually remove files from the "Shared" folder (or whatever
folder had been designated) and prevent them from being shared on
an individual basis.

### b. Searching For and Downloading the Files of Others

To download files from other users, a user launches
LimeWire and inputs a search term or terms.  The application then
seeks matches for those terms in the file names and descriptions of

all files designated for sharing on all computers then running the LimeWire application (or any other application using the Gnutella network).  The application displays a list of file names that match the search terms, and the user can select one or more of those to begin downloading the files.

## II. Discussion

We note at the outset that Lewis's appeal is from the denial of his Rule 29 motion for judgment of acquittal.  To succeed in this claim he must establish that no reasonable jury could have convicted him of the charged crime based on the evidence presented.  United States v. Wilder, 526 F.3d 1, 8 (1st Cir. 2008).  He trains his sights only on the interstate commerce element of the statute, however, conceding for the purposes of this appeal that the other elements were met.

Lewis was convicted of one count of receiving child pornography in violation of 18 U.S.C. § 2252(a)(2).[4]  It is

---

[4]   That provision reads:
    § 2252.   Certain activities relating to material involving the sexual exploitation of minors
    (a) Any person who--
     . . . .
      (2) knowingly receives, or distributes any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce by any means including by

undisputed that Lewis knowingly possessed video files of child pornography, and that he procured those files using his computer, the Internet and LimeWire.  The sole question is whether the government met its burden to prove that the videos had been "shipped or transported in interstate or foreign commerce."[5]

The government introduced evidence, and Lewis did not contest, that he downloaded the images using the Internet.  Lewis, however, contends that § 2252(a)(2) requires the actual shipment or communications of the images across state lines.  And, he continues, the mere fact that he used the Internet is insufficient to prove the images crossed state lines.

The government first challenges Lewis's operating assumption -- that § 2252(a)(2) requires actual shipment or communication of the images across state lines.  The government makes two distinct arguments.  First, it argues that no actual crossing of a state or national border is necessary -- the statute should be read, the government says, to require only transmission

computer or through the mails, if--
　　　(A)  the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
　　　(B) such visual depiction is of such conduct . . . .

shall be punished as provided in subsection (b) of this section.
18 U.S.C. § 2252(a)(2).

[5]  No evidence was presented and no argument was made concerning the "materials containing" prong of the statute, and we do not consider it further.

or shipment in the "stream" or "flow" of commerce. Second, the government argues that even if the statute incorporates a general requirement of actual interstate movement, transmission or shipment by computer should be considered differently than other kinds of shipment or transmission. In that medium, the government argues, the jurisdictional requirement of the statute should be relaxed. We find neither argument convincing.

In making its first argument -- that the statute does not require proof of actual shipment or communication across a border -- the government contends that Congress intended to reach purely intrastate transmission of child pornography that used a channel or instrumentality of interstate commerce. But this is not what the statute says. "Congress uses different modifiers to the word 'commerce' in the design and enactment of its statutes." Circuit City Stores v. Adams, 532 U.S. 105, 115 (2001). "[T]he 'word "involving," like "affecting," signals an intent to exercise Congress' commerce power to the full.' Unlike those phrases, however, the general words 'in commerce' and the specific phrase 'engaged in commerce' are understood to have a more limited reach." Id. (quoting Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 277 (1995)).

Perhaps just as important, the government's argument here would prove too much. Previous cases treated the parallel jurisdictional requirements of § 2252(a) as requiring some actual

-10-

movement across state lines.[6] See United States v. Robinson, 137 F.3d 652, 653 (1st Cir. 1998) (upholding conviction under § 2252(a)(4) and mentioning specifically that "the fifty photographs were all taken using a Kodak instant camera and Kodak instant film, both of which were manufactured by the Eastman Kodak Company outside of Massachusetts"); see also United States v. Smith, 459 F.3d 1276, 1282 (11th Cir. 2006) (relying on proof that materials had actually crossed state lines to satisfy jurisdictional element). Similarly, this court has held that intent to ship child pornography across state lines is not required for a conviction under § 2251, which contains the same language. Barber v. United States, 1993 U.S. App. LEXIS 21198, at *4-*5 (1st Cir. Aug. 23, 1993) (unpublished opinion) (per curiam). That case concerned a

---

[6]     The relevant language in § 2252(a)(4)(B) criminalizes the possession of "[one] or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer" provided the depiction is of sexually explicit conduct by a minor and the depiction was created involving the use of a minor engaging in sexually explicit conduct. Thus, § 2252(a)(4)(B) allows the jurisdictional element to be satisfied in two ways: either the depiction has been "mailed, or has been shipped or transported in interstate or foreign commerce" or else it has been "produced using materials which have been mailed or so shipped or transported." Id. The same jurisdictional language appears in § 2252A(a)(3),(5) and (6). The syntax of these two requirements compels us to read them as meaning the same thing by "shipped or transported." Section 2252(a)(2), under which Lewis was convicted, does not include this second "produced using materials" prong, but interpretation of "shipped or transported in interstate commerce" in that prong sheds light on its meaning in the first.

defendant who admitted mailing undeveloped film to an address in Massachusetts for developing, but he denied intending or knowing that the film would thence be forwarded to Virginia. We held that actual interstate transportation, without intent, satisfied the statute. This holding would have been unnecessary, indeed nonsensical, if no crossing of state lines need have been shown at all -- the defendant admitted mailing the images intrastate and having done so intentionally. Id. "Shipped or transported in interstate commerce" here must require interstate movement.

The interstate commerce requirement at issue here is like that of many other criminal statutes. See, e.g., 18 U.S.C. § 1343 ("Whoever . . . transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce [the relevant materials shall be guilty of a crime]."); Id. § 2314 (subjecting to criminal liability "[w]hoever transports, transmits, or transfers in interstate or foreign commerce" the items subject to the statute). These provisions, too, have long been held to require actual crossing of a state or national border. See, e.g., United States v. Potter, 463 F.3d 9, 16 (1st Cir. 2006) (relying on "interstate faxes" to satisfy one element of § 1343); United States v. Cassiere, 4 F.3d 1006, 1011 (1st Cir. 1993) (elements of § 1343 include "the use of interstate wire communications"); Efron v. Embassy Suites (P.R.), Inc., 47 F. Supp. 2d 200, 205 (D.P.R. 1999) (dismissing wire fraud charges because

"none of these facsimile transmissions [were] alleged to have traveled on interstate phone lines, a necessary component of the actus reus needed for indictment under the wire fraud statute"); First Circuit Pattern Jury Instructions, § 4.20 (actual interstate movement required for § 2314). The government, then, cannot excise completely the requirement that the child pornography cross a state or national border. To hold otherwise would do violence to the plain language of the statute and fly in the face of practice, including that of the government itself, with regard to this and a host of similarly worded statutes.

The government's second argument attempts to create a distinction between items that are "shipped or transported" using a computer, and those that are "shipped or transported" using other means. While we concede that it is possible Congress meant to make purely intrastate transmission by computer of these materials into a federal crime, by the plain language of the statute, it did not do so. We are therefore constrained from altering the statute based on our assumptions about what Congress wanted.

Congress added the words "by any means including by computer" to the statute in 1988. Nov. 18, 1988, P.L. 100-690, Title VII, Subtitle N, Ch 1, § 7511(b), 102 Stat. 4485. The clause does evince a particular concern with computer transmission of child pornography, but its placement -- modifying "has been shipped or transported . . . in interstate commerce" cannot indicate that

special rules apply to computer shipment or transmission.  The plain language of the statute indicates that we are to treat shipment or transmission by computer the same way we would shipment or transmission by any other means.  While the government's argument may be sensitive to Congress's actual desires in altering the statute, we must be bound by what Congress wrote, not what it wanted.  We "must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) (internal quotation marks and citations omitted).

Having concluded that § 2252(a)(2) does require that the government prove actual interstate transmission or shipment of the images, we turn to the government's next argument -- that it proved interstate transmission occurred in this case because the prosecution introduced evidence that Lewis used the Internet.[7]  In support of this argument the government cites two of our prior cases, Carroll and Hilton.  After close review of the holdings in

---

[7]    We do not consider the question of whether Congress has sufficient power under the Commerce Clause to regulate the intrastate transmission of child pornography.  We have upheld the statute at issue under the Commerce Clause, and the parties here do not dispute that result.  United States v. Morales-De Jesus, 372 F.3d 6, 17 (1st Cir. 2004); see also Gonzales v. Raich, 545 U.S. 1, 9 (2005) (upholding Congress's power to regulate intrastate, noncommercial activity that in the aggregate affects interstate commerce that Congress has determined to proscribe).

these cases, we agree with the government that Lewis' sufficiency claim must fail.

In Carroll, 105 F.3d 740, we addressed whether there was sufficient evidence to convict the defendant of violating 18 U.S.C. § 2251(a) which criminalizes the production of child pornography, "if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce by any means, including by computer." We cited three different ways the government had satisfied the interstate transmission element of the statute. One of them was by presenting evidence that the defendant planned to use the photographs he took as illustrations for a "dating service" site on the Internet. We wrote, "[t]ransmission of photographs by means of the Internet is tantamount to moving photographs across state lines and thus constitutes transportation in interstate commerce." Id. at 742 (citation omitted).

The second case the government cites is United States v. Hilton, 257 F.3d 50 (1st Cir. 2001). That case concerned whether there was sufficient evidence to convict the defendant of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). In addressing the defendant's argument that the government failed to prove beyond a reasonable doubt that the images he possessed traveled in interstate commerce, we cited Carroll and held that "[u]nder the case law, proof of transmission

of pornography over the Internet or over telephone lines satisfies the interstate commerce element of the offense." Id. at 54.

In light of these two cases, we conclude that the government proved the images traveled interstate when it introduced evidence that Lewis received images that were transmitted over the Internet.

We are not alone in holding that the government may satisfy the interstate commerce element by proving that child pornography images were transmitted over the Internet. Two other circuits, citing Carroll, have reached the same conclusion. In United States v. Runyan, 290 F.3d 223, 239 (5th Cir. 2002), the Fifth Circuit, quoting Carroll, held that proof of use of the Internet was sufficient to find the interstate commerce element of § 2251(a) satisfied. Runyan, 290 F.3d at 239. And the Third Circuit similarly quoted Carroll as supporting its holding that § 2252(a)(2)'s interstate commerce element was satisfied by the defendant's use of the Internet. United States v. MacEwan, 445 F.3d 237, 244 (3d Cir. 2006) ("because of the very interstate nature of the Internet, once a user submits a connection request to a website server or an image is transmitted from the website server back to the user the data has traveled in interstate commerce").[8]

_____

[8]  See also United States v. White, 2 Fed. App'x. 295, 298 (4th Cir. 2001) (unpublished opinion) (quoting Carroll in its holding that use of the Internet is transportation in interstate commerce); United States v. Smith, 47 M.J. 588, 592 (N-M. Ct. Crim. App. 1997) ("[W]e hold that the transmission of information in 'cyberspace' would constitute a transportation in interstate commerce.")

Lewis makes a fair attempt at distinguishing both Carroll and Hilton from this case. With respect to Carroll, he makes three arguments. First, he notes that our holding in Carroll that "[t]ransmission of photographs by means of the Internet . . . constitutes transportation in interstate commerce" was supported with citations to two other cases -- United States v. Thomas, 74 F.3d 701, 706-07 (6th Cir. 1996) and United States v. Maxwell, 42 M.J. 568, 580 (U.S.A.F.C.A. 1995). Our holding then, he argues, must be interpreted through the lens of those cases, and neither of them stands for the broad proposition we attributed to them. Nevertheless, even if we were to accept Lewis' argument that we were overly generous in our reading of Thomas and Maxwell, that does not change the binding conclusion we reached in Carroll. Next, Lewis contends that, unlike the defendant in Carroll, he objected to the interstate commerce element at trial. Although this may be true, we fail to see how this factual distinction undermines the applicability of Carroll in any respect. As it is in this case, in Carroll our attention was squarely trained on whether the government introduced evidence sufficient to satisfy the statute's interstate commerce element. Finally, Lewis argues that, unlike in this case, in Carroll there was other, "substantial evidence" of interstate movement. True, we identified other grounds for our holding in Carroll. For example, we noted that the

(relying also on Carroll).

-17-

defendant told an individual that he intended to take film across state lines. Carroll, 105 F.3d at 742. Nevertheless, that alternative grounds existed for our holding fails to detract from our express conclusion that the use of the internet in that case was enough, standing alone, to satisfy the jurisdictional element. See id.

Lewis's attack on the Hilton decision is even less convincing. He essentially attacks that case for not reading Carroll as he does. As developed above, Lewis' interpretation of Carroll is overly narrow. Although we could accept Lewis' invitation to construe the Carroll and Hilton decisions as he does, to do so would be disingenuous.

For the sake of completeness, we should note that Congress recently amended the child pornography statutes, including the one before us, to expand the jurisdictional coverage. It did so by replacing all instances of "in interstate" with "in or affecting interstate" commerce. Effective Child Pornography Prosecution Act of 2007, Pub. L. No. 110-358, § 103. The legislative history indicates that Congress was unhappy with circuit court decisions narrowly construing the prior statute and wanted to put issues like ours to rest. See 153 Cong. Rec. H13591-92 (daily ed. Nov. 13, 2007) (statement of Rep. Conyers); id. at H13592 (statement of Rep. Goodlatte). Despite these recent developments, this case is governed by the statute as written at

the time of Lewis's conduct, and our interpretation rests only on the law as it stood at that time.

### III. Conclusion

For the reasons stated above, the judgment below is **affirmed.**

**<u>AFFIRMED</u>**.