# United States Court of Appeals
## For the First Circuit

No. 08-1343

UNITED STATES,

Appellee,

v.

MARK DAVID DYER,

Defendant, Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Ripple[*], Circuit Judges.

William S. Maddox for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom
Paula D. Silsby, United States Attorney was on brief, for appellee.

December 28, 2009

---

[*]    Of the Seventh Circuit, sitting by designation.

**LYNCH**, **Chief Judge**. At issue is the meaning and application of a 2003 Sentencing Guideline for possessing child pornography, § 2G2.4(c)(2), which instructed sentencing judges to apply the stiffer penalties for trafficking in child pornography cases "[i]f the offense involved trafficking in material involving the sexual exploitation of a minor . . . including . . . possessing material involving the sexual exploitation of a minor with intent to traffic." U.S.S.G. § 2G2.4(c)(2). The issue is one of first impression for this circuit. The defendant, Mark David Dyer, primarily argues that the sentencing judge erred in determining that the evidence sufficed to establish he had an intent to traffic in child pornography under § 2G2.4(c)(2) of the 2003 Sentencing Guidelines, thus adding a minimum of thirteen additional months to the defendant's Sentencing Guidelines range. Despite this, the trial judge exercised his discretion to sentence below the range, and sentenced Dyer to sixty months in prison, followed by eight years of supervised release.

Dyer pleaded guilty to possession of child pornography, in violation of 18 U.S.C. § 2252(A)(a)(5)(B). The original guideline range for the total offense level under possession was fifty-seven to seventy-one months; the application of the trafficking guideline made it seventy to eighty-seven months. Dyer argues on appeal that the district court wrongly interpreted and applied § 2G2.4(c)(2), the trafficking cross-reference.

He also argues that the district court relied upon ex parte grand jury testimony to reach its factual conclusions and thereby violated his rights under the Confrontation Clause.

We disagree with both arguments and affirm his sentence based on the facts of this case.

I.

The basic facts are undisputed.  On June 4, 2004, agents of the Federal Bureau of Investigation (FBI) executed a warrant to search the Brunswick, Maine residence of Mark David Dyer.  The agents seized a computer hard drive and ten compact disks (CDs), all of which were later found to contain numerous images of child pornography.

Later that day, Dyer consented to an interview with Special Agents James Lechner and Paul Pritchard.  Dyer told them that he owned the computer and the CDs and that no one else had access to them.  The CDs, Dyer conceded, contained images that would likely qualify as child pornography.  He admitted that he had downloaded what he estimated to be several thousand nude pictures of twelve- or thirteen-year-old girls, had saved these images on his computer, and had burned them onto CDs.  He obtained these images, he told Agents Lechner and Pritchard, either by temporarily joining subscription-only websites or through the use of the LimeWire peer-to-peer file-sharing program.  Dyer used these methods once or twice a week to obtain new pornographic images of

prepubescent girls aged fourteen or younger.  When asked about a notebook seized during the search, Dyer explained that he had used it to list common keywords like "pedo," "teen," and "pre-teen" that he entered into LimeWire to find new files.

Dyer had used LimeWire for two years and explained his understanding of the program to Agents Lechner and Pritchard.  He knew, he said, that when he downloaded photographs or videos from LimeWire, the program saved the files in a "Completed Folder" on his hard drive.  This folder, Dyer noted, was automatically treated as a "shared" folder by the LimeWire software.  Dyer knew that anything he downloaded would therefore be available for other LimeWire users to keyword search and download.  He also knew how to stop the material from getting to other LimeWire users.  To prevent this file folder from being shared with other users, Dyer added, he would have had to transfer the file to another location on his hard drive.  He had not done so.

Forensic analysis of Dyer's computer and CDs revealed several hundred images of what appeared to be child pornography.  When the National Center for Missing and Exploited Children (NCMEC) analyzed the images at the FBI's request, it determined that Dyer had downloaded 952 photographs and four videos featuring known and actual child victims of sexual exploitation.

The most graphic of these images was a series featuring a single prepubescent girl.  The NCMEC confirmed, and Dyer did not

dispute, that the girl featured in these images was an actual child and a known victim of sexual abuse. One of the photographs in the series showed an adult male urinating on the young girl. In another photograph, the girl had been posed on a bed naked, with the words "cut me," "hurt me," and "slut" written across her torso. The image also showed someone holding a knife near her vagina. This image was saved under the file name "PTHC, Ultra Hard Pedo Child Porn Pedofilia (New) 061.JPEG." Dyer had stored the entire series featuring the girl in the "shared" folder on his computer hard drive, making it available to all LimeWire users.

Other files in Dyer's "shared" folder had titles such as "pthc_kely&camila07 young girls rub pussies together.jpg"; many included the acronym "pthc," standing for "pre-teen hard-core," in the title.

An August 22, 2007 indictment charged Dyer with knowingly possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).[1] On November 28, 2007, Dyer pleaded guilty to this charge in the federal district court of Maine.

The court applied the 2003 version of the Sentencing Guidelines in order to avoid ex post facto considerations. The pre-sentence report (PSR) submitted to the district court calculated a total offense level of 25 under the 2003 Sentencing

---

[1] The government also charged Dyer with transportation of child pornography but ultimately asked the trial judge to dismiss this count.

Guidelines. The PSR used U.S.S.G. § 2G2.4, which applied to defendants convicted of possession of child pornography and carried a base offense level of 15, and adjusted the sentence upwards to reflect a number of relevant enhancements.[2]

At the pre-sentence conference, the government argued that the PSR should have applied the trafficking cross-reference in U.S.S.G. § 2G2.4(c)(2) and should have therefore used the trafficking provision rather than the possession provision to calculate Dyer's base offense level for sentencing. The sentence enhancement under the trafficking cross-reference should have been imposed, the government contended, because Dyer had manifested an intent to distribute the child pornography on his computer by making it accessible to other LimeWire users. Dyer argued that leaving files on a shared computer folder did not qualify as "trafficking" and that, in any event, there was insufficient evidence that he had intended to traffic in child pornography.[3]

At the sentencing hearing on March 13, 2008, Agent Lechner testified and was cross-examined regarding his interview

---

[2] Specifically, the PSR calculated a two-level enhancement for materials involving a prepubescent minor, another two-level enhancement for possession involving the use of a computer, a four-level enhancement for possession of images involving sadism and masochism, and a five-level enhancement for possession of over 600 images. The PSR also adjusted for Dyer's acceptance of responsibility, resulting in a final offense level of 25.

[3] Dyer also contested the recommended enhancements for possession of sadistic images and for possession of more than 600 images. He does not, however, challenge these enhancements, which the court applied, on appeal.

with Dyer. Lechner described his role in the search of Dyer's residence, his subsequent interview with Dyer, and the FBI's ultimate conclusions regarding the quantity and nature of the images of child pornography discovered on Dyer's computer and CDs. He testified that Dyer had said during the interview that he understood that the child pornography downloaded onto his shared drive would be made available to other LimeWire users. The government also introduced Lechner's contemporaneous report of the interview into evidence. The report included Dyer's admission that he knew how to prevent the files from being shared. He had opted not to disable this feature. Another exhibit displayed the results of the forensic analysis of Dyer's computer and a selection of the more graphic images discovered in Dyer's "shared" folder. Dyer did not introduce any evidence at sentencing.

On the basis of this evidence and a Fifth Circuit case involving similar facts, United States v. Todd, 100 F. App'x 248 (5th Cir. 2004), the district court applied the trafficking cross-reference in U.S.S.G. § 2G2.4(c)(2). However, it did so on the basis of the specific facts of the case and implicitly rejected the government's argument that any use of LimeWire would automatically constitute trafficking due to the program's file-sharing features. "Trafficking," the sentencing judge noted, included bartering, and Dyer had exhibited an "intent to traffic" by knowingly making images of child pornography available to other LimeWire users. The

sentencing judge emphasized the facts essential to this conclusion: Dyer had told Agent Lechner that he knew that any file downloaded from LimeWire would be available to other users; he knew where LimeWire stored the files he downloaded on his computer, and that they could be accessed and downloaded by other LimeWire users; he knew that he could have moved the file to a different location to prevent other users from accessing it; and he had used LimeWire for two years, during which he downloaded files and had his own files available for download. These acts, the sentencing judge found, demonstrated an intent to traffic within the meaning of § 2G2.4(c)(2). The sentencing judge also determined that this conclusion was consistent with Congress's intention to punish those who furthered the market for child pornography more severely, reasoning that file-sharing was qualitatively different from mere possession of files on an inaccessible computer hard drive location.

In calculating Dyer's sentence, the sentencing judge emphasized that Dyer had pleaded guilty to an exceptionally serious offense that involved the sexual abuse of real children. But the sentencing judge also acknowledged that Dyer had received an honorable discharge from the United States Navy and was a first-time offender who had shown remorse and a willingness to undergo a sex offender treatment program. Dyer's total offense level under the Guidelines was twenty-seven, which would ordinarily result in

a prison sentence of between seventy and eighty-seven months. However, in light of Dyer's character and circumstances, the sentencing judge imposed a below-Guidelines sentence of sixty months in prison, followed by eight years of supervised release.

Dyer now appeals this sentence.

II.

A.          Interpretation of Guidelines Terms

Dyer's main argument on appeal is that the facts of his case supported only the application of the guidelines pertaining to possession of child pornography, and not "trafficking." The district court's interpretation of the meaning of an "intent to traffic" under § 2G2.4(c)(2) and of the cross-reference are questions of law, which we review de novo. See United States v. Cruz-Rodriguez, 541 F.3d 19, 32 (1st Cir. 2008). We review the district judge's findings of fact for clear error, and the government must prove facts essential to sentencing enhancements by a preponderance of the evidence. Id. at 31 & n.8.

The issue before us is not whether mere use of LimeWire by one who possesses child pornography shows an intent to traffic simply because LimeWire is a file-sharing program. The government has withdrawn that argument and the district court did not adopt it. Rather, the outcome of this case depends upon the particular facts and not on a per se rule. Dyer's challenge raises issues of

interpretation of both "intent" and "traffic," but ultimately turns on the facts.

The Guidelines set forth a distinction between "possession" of and "trafficking" in child pornography as those terms are used in U.S.S.G. §§ 2G2.4 and 2G2.4(c)(2). Dyer suggests a series of limitations on the definition of trafficking, which we reject. To define the kind of acts that constitute "trafficking" as opposed to mere possession, we employ ordinary rules of statutory construction. See United States v. Luna-Diaz, 222 F.3d 1, 3-6 (1st Cir. 2000) (looking to the text, guideline commentary, statutory context, and use of similar language in criminal statutes to interpret the meaning of a term in U.S.S.G. § 2L1.2); United States v. DeLuca, 17 F.3d 6, 10 (1st Cir. 1994) (holding that the Sentencing Guidelines should be interpreted according to principles of statutory construction).

The text of the 2003 Sentencing Guidelines separated sentencing for the possession and trafficking of child pornography into two distinct subsections. Sentencing judges were to apply U.S.S.G. § 2G2.2 to defendants convicted of trafficking in child pornography; receiving, transporting, shipping, or advertising such material; or possessing such material with an intent to traffic. This guideline carried a base offense level of 17. U.S.S.G. § 2G2.2. By contrast, U.S.S.G. § 2G2.4 prescribed a base level of

15 for defendants convicted only of possessing child pornography. U.S.S.G. § 2G2.4, subject to the condition we describe next.

The condition is that a cross-reference in the possession guideline, § 2G2.4(c)(2), mandated that "[i]f the offense involved trafficking in material involving the sexual exploitation of a minor (including receiving, transporting, shipping, advertising, or possessing material involving the sexual exploitation of a minor with intent to traffic)," then the sentencing judge was to use § 2G2.2, the trafficking guideline, instead. U.S.S.G. § 2G2.4(c)(2).[4]

As a result, the plain language of § 2G2.4(c)(2) unambiguously extended the trafficking cross-reference both to defendants who actually trafficked in child pornography and to defendants who possessed child pornography with the intent of trafficking but had not yet completed the act. In other words, this trafficking cross-reference, by its terms, could be imposed even absent evidence that others received child pornography from the defendant.

---

[4] Subsequent amendments to the Guidelines consolidated these offenses into a single subsection, with provisions for sentencing enhancements and reductions depending upon the extent to which a defendant's conduct went beyond mere possession. See U.S.S.G. § 2G2.2 (2004) (Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, Soliciting, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic; Possessing Material Involving the Sexual Exploitation of a Minor).

The government needs only to demonstrate by a preponderance of the evidence that a defendant possessed the requisite "intent to traffic." See, e.g., United States v. Jordan, 111 F. App'x 65, 68 (2d Cir. 2004). Dyer unsuccessfully advances limitations, not in the text, on what "intent" means and on what "traffic" means. We, like the Second Circuit in Jordan, reject Dyer's argument that the cross-reference in § 2G2.4(c)(2) governed only when the government proved that the defendant actually engaged in trafficking and did not merely intend to do so.[5] We also reject Dyer's argument that the government must show that third parties actually retrieved and downloaded images from defendant's computer to show that the defendant had an intent to traffic.

First we address the legal arguments about the meaning of the terms "traffic" and "intent"; we then turn to whether, in light of those meanings, the facts sufficed to meet those definitions.

1.      Meaning of "Traffic" under § 2G2.4(c)(2)

Because the 2003 Guidelines do not define the term "traffic," we interpret this word by looking to its commonly accepted meaning. See DeLuca, 17 F.3d at 9. To traffic in something commonly means [t]o "trade or deal in (goods, esp.

_____

[5]      While Jordan was an unpublished Second Circuit opinion, we consider it to be persuasive authority since it squarely addressed the same argument made by the defendant in the present appeal. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 314 F. Supp. 2d 201, 203 n.1 (S.D.N.Y. 2003) (treating Second Circuit unpublished opinions "at least" equivalent in authority to law review notes).

illicit drugs or other contraband)," Black's Law Dictionary 1634 (9th ed. 2009), or to engage in "the activity of exchanging commodities by bartering or buying and selling," Webster's Third New International Dictionary 2422 (1993).

At oral argument, defendant argued that mere trading or bartering of child pornography is not trafficking. We reject the argument. We also reject the argument that a defendant must expect some financial gain from trafficking. In the context of § 2G2.4(c)(2), a defendant traffics in child pornography if he engaged or intended to engage in an exchange or trade of such images. No financial gain or expectation of financial gain is necessarily required. See United States v. Todd, 100 F. App'x 248, 250 (5th Cir. 2004), vacated on other grounds, 543 U.S. 1108 (2005) (noting that "trafficking" ordinarily means "both buying and selling commodities for money and exchanging commodities by barter"); United States v. Parmelee, 319 F.3d 583, 594 (3d Cir. 2003) (observing that "trafficking" under § 2G2.2 includes bartering); United States v. Johnson, 221 F.3d 83, 98 (2d Cir. 2000) (same); United States v. Horn, 187 F.3d 781, 791 (8th Cir. 1999) ("Section 2G2.2 and the cross reference in § 2G2.4(c)(2) apply when the offense involved the exchange or barter of [child pornography], and not only . . . when this material was offered for sale."). These cases confirm that the crucial acts separating mere

possession from trafficking involve the intent to share images of child pornography with others, irrespective of financial motive.

This interpretation is also borne out by the legislative history of the 1977 Protection of Children Against Sexual Exploitation Act (Act), which was amended in 1996 to include 18 U.S.C. § 2252A. See Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, 121, 110 Stat. 3009, 3009-26 to 3009-4 (codified as amended in 18 U.S.C. § 2251, 2252-2252A, 2256 and 42 U.S.C. § 2000aa); see also United States v. Sromalski, 318 F.3d 748, 751-52 (7th Cir. 2003) (finding that § 2G2.2 and related guidelines should be interpreted in relation to the harms Congress identified when passing this Act). Section 2252A includes separate subsections prohibiting the distribution, sale, and possession of child pornography, with a further section prohibiting the distribution of child pornography to minors with the intent of inducing them to participate in illegal activities. See 18 U.S.C. § 2252A(a)(1)-(6). For purposes of punishment, § 2252A(b) distinguishes between possession and all other offenses, mandating a maximum sentence of 10 years for possession and a sentence between five and twenty years for all other offenses. See id. § 2252(b)(1)-(2).

The rationale underpinning the 1996 amendments, Congress said, was that the dissemination and production of child pornography differs from possession because active participation in

-14-

the market for child exploitation encourages further exploitation of children to an even greater degree.  See H.R. Rep. No. 104-863, at 28-29 (1996) (Conf. Rep.); see also United States v. Grosenheider, 200 F.3d 321, 332-33 (5th Cir. 2000) (footnote omitted) ("It is clear that Congress established a series of distinctly separate offenses respecting child pornography, with higher sentences for offenses involving conduct more likely to be, or more directly, harmful to minors than the mere possession offense.  Similarly, the guidelines clearly reflect consideration of whether and the degree to which harm to minors is or has been involved.").

Congress further found that child pornography victimizes children not only at the time of actual abuse but each time the image is accessed and distributed anew, since "its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years."  H.R. Rep. No. 104-863, at 28.  By this metric, trafficking is qualitatively different from mere possession--and warrants heavier sanctions.  It makes these images available to new viewers and keeps an image of exploitation in circulation, and thus may encourage the growth of a market leading to further exploitation.  See New York v. Ferber, 458 U.S. 747, 756-59 & n.10 (1982); United States v. Hoey, 508 F.3d 687, 692-93 (1st Cir. 2007).

Second, the legislative history unequivocally shows that "trafficking" in child pornography means bartering these materials even when no financial stake is involved. In 1984, Congress expressly found that the child pornography market was dominated by collectors who bartered pornographic images to expand their collections and had little interest in trading for profit. See H.R. Rep. No. 98-536, at 16-17 (1984); see also United States v. Morales-De Jesús, 372 F.3d 6, 11 (1st Cir. 2004) (explaining that Congress eliminated the commercial purpose requirement because of the prevalence of child pornography distributors who shared images with each other with no pecuniary motivation). Concerned that the Act was being under-enforced, Congress amended the statute specifically to ensure that it extended to these collectors. See Child Protection Act of 1984, Pub. L. No. 98-292, 98 Stat. 204 (codified as amended at 18 U.S.C. §§ 2251, 2252, 2253); see also H.R. Rep. 98-536 at 2 (1983). Because "the harm to the child exists whether or not those who initiate or carry out the schemes are motivated by profit," Congress deliberately broadened the scope of the Act to better serve its purpose. H.R. Rep. 98-536, at 2-3.[6]

---

[6] As we observed in Morales-De Jesús, we consider the legislative history and the congressional findings of prior iterations of the Act relevant to its present meaning, since "when Congress previously passed related legislation accompanied by applicable findings, subsequent legislation was 'presumably based on similar findings and purposes with respect to the areas newly covered.'" 372 F.3d at 10 n.2 (quoting Maryland v. Wirtz, 392 U.S. 183, 190 n.13 (1968)).

Based on this analysis, we conclude that the district court properly interpreted the trafficking cross-reference under § 2G2.4(c)(2) to include situations in which a defendant intended to exchange child pornography without any commercial purpose.

2.      Meaning of "Intent" Under § 2G2.4(c)(2)

Before the district court, Dyer never used the term "specific intent" to set forth the legal requirements for applying § 2G2.4(c)(2), and has waived the argument.  As a result, the district court did not directly comment on the meaning of the term "intent" as used in § 2G2.4(c)(2).  It rather concluded that in light of the specific facts concerning Dyer's use of LimeWire, the intent requirement had been met.  Dyer raises for the first time on appeal the argument that § 2G2.4(c)(2) requires evidence of specific intent, but only in passing and without any legal argument to support this assertion.  This argument is twice waived on appeal.  We accordingly review it for plain error.  We find there was no error of law, and we reject a reading of § 2G2.4(c)(2) that would require specific intent to traffic in child pornography.

This court recently emphasized the challenges in defining the term "intent" when it is used to denote an element of a crime. See United States v. Tobin, 552 F.3d 29, 32 (1st Cir. 2009) ("'Few areas of criminal law pose more difficulty than the proper definition of the *mens rea* required for any particular crime.'") (emphasis original) (quoting United States v. Bailey, 444 U.S. 394,

403 (1980)).  In Tobin, we interpreted "intent" as used in a criminal statute prohibiting harassing phone calls by employing principles of statutory construction and looking to plain meaning, statutory structure, and legislative history.  When these indicia were inconclusive, we turned to "general considerations," namely the principle that for most crimes, "intent" ordinarily requires only that the defendant reasonably knew the proscribed result would occur (general intent), not that the defendant specifically intended such an outcome as his purpose (specific intent).  Id. at 33 (citing Bailey, 444 U.S. at 404); see also United States v. Pitrone, 115 F.3d 1, 5 (1st Cir. 1997) (observing and applying the rule that when the text of a criminal statute is indeterminate, courts should look to context, including purpose, legislative history, and "background legal principles," to discern the kind of intent Congress had in mind).

We then reasoned that this principle that "intent" ordinarily means general intent would have less force in some situations where the consequences of the action are not necessarily wrong or harmful.  Thus, when interpreting 47 U.S.C. § 223(a)(1)(D), which prohibits making repeated phone calls to the same number with an intent to harass, Tobin held that the government must prove the defendant specifically intended to harass the person at the called number because "[t]here is nothing

inherently wicked or even suspect about multiple phone calls" absent the wicked intention motivating them. Id.

"Intent" has at least two possible ordinary meanings in the criminal context, referring either to the fact that a defendant purposefully and affirmatively desired an unlawful outcome or, alternatively, to a defendant's reasonable knowledge that his acts might result in such an outcome. See Bailey, 444 U.S. at 403-04.

The texts of § 2G2.4 and § 2G2.2 are not explicit on what kind of scienter requirement the Commission intended. While § 2G2.2 pertains to trafficking and § 2G2.4 is predominantly concerned with possession, both guidelines penalize conduct that Congress has deemed inherently harmful. That the Guidelines enhance punishment for both actual trafficking and for intent to traffic suggests the Commission intended to enhance penalties for those whose actions support the market for child pornography and for those who should reasonably know that their conduct would do so. There is no indication that the Commission intended to depart from the ordinary meaning of the term "intent." Further, there is every reason to think the Commission was, in this understanding of intent, carrying out congressional intent. Certainly, the Commission chose not to use alternate language which would have required specific intent.

The dissent incorrectly argues that the phrase "with intent to" is a term of art that mandates the conclusion that

-19-

§ 2G2.4(c)(2) requires proof that a defendant specifically intended to traffic in child pornography. That argument is undercut by Bailey, which noted that "the word 'intent' is quite ambiguous" when interpreting what the court of appeals had meant when using that precise phrase. 444 U.S. at 633. The use of the words "intent to traffic" does not by itself signify specific intent, as numerous other courts have found in other contexts. For instance, 18 U.S.C. § 2320 punishes anyone who, inter alia, "intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services." 18 U.S.C. § 2320(a)(1). Other circuits have held that specific intent was not required for culpability, on the grounds that specific intent requirements are not ordinarily prerequisites in criminal offenses and the legislative history did not support such an interpretation. See, e.g., United States v. Gantos, 817 F.2d 41, 42-43 (8th Cir. 1987). Likewise, the Second Circuit has interpreted 18 U.S.C. § 479, which makes it a crime to "knowingly and with intent to defraud, utter[], pass[], or put off, in payment or negotiation, any false, forged, or counterfeited" foreign bonds, only as a general intent crime. See United States v. Mucciante, 21 F.3d 1228, 1235 (2d Cir. 1994).[7]

---

[7] One circuit has also held that 18 U.S.C. § 115(a)(1)(B), which prohibits threats of assault, kidnaping, or murder against federal officials, judges, and law enforcement officers "with intent to" inhibit their official duties or "with intent to" retaliate against them, is a general or specific intent crime. See

Indeed, treating such language as per se imposing a specific intent requirement runs counter to the careful, context-specific weighing of text, structure, legislative history, and general considerations that we have long employed and is contrary to our analysis in <u>Tobin</u>.

The legislative history, in turn, supports a reading that intent in the sense of knowledge suffices. Congress described the evils of the child pornography market by focusing on the child victims involved, not by distinguishing between the motives of purveyors. Trafficking in child pornography has an equally horrific effect upon the children involved irrespective of whether the trafficker actively desires or merely knows that his actions will likely make images of child pornography more available to others. That Congress eliminated the requirement that traffickers in child pornography could only be prosecuted if they were acting with a commercial purpose underscores Congress' understanding that such conduct is culpable regardless of the underlying motive. <u>See</u> H.R. Rep. 98-536, at 16-17.

We also turn to the "general considerations" explained in <u>Tobin</u>. These considerations strongly confirm that § 2G2.4(c)(2) does not require specific, purposeful intent. We should instead rest upon the default assumption discussed in <u>Bailey</u> and elsewhere

United States v. <u>Ettinger</u>, 344 F.3d 1149, 1156 (11th Cir. 2003); <u>but</u> <u>see</u> <u>United States</u> v. <u>Veach</u>, 455 F.3d 628, 631-32 (6th Cir. 2006) (requiring specific intent); <u>United States</u> v. <u>Stewart</u>, 420 F.3d 1007, 1017 (9th Cir. 2005) (same).

-21-

that an intent to traffic in child pornography, like most other crimes, requires only general intent. Unlike the repeated phone calls at issue in Tobin, sharing child pornography qualifies as inherently bad conduct. Indeed, Tobin itself makes this exact distinction. Another subsection of the statute at issue in Tobin prohibited making phone calls if those calls involved content that could be considered child pornography, with the intent to harass another person. Tobin stated that this subsection "involve[d] suspicious or even malign conduct" and concluded that unlike the provision at issue, "intent" in this subsection meant only "mere knowledge of consequences." Tobin, 552 F.3d at 33.[8]

Further, courts are ordinarily concerned with the distinction between specific and general intent when defining elements of a crime in order to put defendants on notice of where the line between culpable and innocent conduct falls. See, e.g., Carter v. United States, 530 U.S. 255, 268-69 (2000). No such concern applies at sentencing. Courts routinely interpret the Sentencing Guidelines by looking at related conduct beyond the specific elements of a criminal offense, because the purpose is to

_____

[8] While we have recognized that the crime of possession of a controlled substance with intent to distribute requires proof that the defendant specifically and purposefully intended to traffic in drugs, that conclusion resulted from statutory language that includes the phrase "knowingly or intentionally" and by concerns with overbreadth. See, e.g., United States v. Hassan, 542 F.3d 968, 979 (2d Cir. 2008); United States v. Caseer, 399 F.3d 828, 839 (6th Cir. 2005). Both of those concerns are inapplicable in the present context.

assess the severity of the defendant's particular crime in light of the surrounding circumstances.  See Witte v. United States, 515 U.S. 389, 402-03 (1995).  In so doing, courts are not punishing a defendant for a distinct offense; they are instead evaluating the totality of a defendant's conduct in order to arrive at a reasonable sentence.  See United States v. Amirault, 224 F.3d 9, 15 (1st Cir. 2000) (holding that a sentencing court can look to past, uncharged conduct to impose an aggravated sentence for the possession of child pornography because such conduct bears upon the gravity of the possession offense).

We therefore reject the defendant's argument that the government must necessarily show the defendant actively and subjectively desired that others would get images of child pornography from him and that ordinary general intent does not suffice.

B.         Application of "Intent to Traffic" in This Case

We consider the district court's application of this guideline to the facts of this case to be a mixed question of law and fact, which we review using a sliding standard of review.  We review predominantly legal questions de novo, while we defer to fact-driven determinations and review them for clear error.  See United States v. Sicher, 576 F.3d 64, 70-71 & n.6 (1st Cir. 2009).  The district court's application of § 2G2.4(c)(2) in this case was heavily fact-dependent, and we find that it did not err in

concluding that Dyer's online conduct showed an "intent to traffic" under § 2G2.4(c)(2). We would reach this conclusion even if we were to review the district court's application of § 2G2.4(c)(2) de novo.

The Internet, and its capacity to facilitate online bartering of computer files between collectors and purveyors of child pornography, readily links a single computer user to a possible network of others. See United States v. Lewis, 554 F.3d 208, 210 (1st Cir. 2009). It is clear that for there to be any meaningful distinction between the crimes of possession and the enhancement for intent to traffic, more than mere receipt of child pornography on a computer must be shown for § 2G2.4(c)(2) to apply. Sromalski, 318 F.3d at 751-52. Other circuits have held that this cross-reference applies to defendants who arranged to exchange images of child pornography with others over e-mail or by posting these images in an online chatroom. See, e.g., United States v. Bender, 290 F.3d 1279, 1285 (11th Cir. 2002) (applying cross-reference to defendant who traded child pornography over email); United States v. Johnson, 221 F.3d 83, 98 (2d Cir. 2000), cert denied, 533 U.S. 953 (2001) (applying 2G2.4(c)(2) to defendant who conceded that he "sen[t] and received" images of child pornography on his computer).

We do not decide whether the use of file-sharing software such as LimeWire per se would have qualified as trafficking under

-24-

§ 2G2.4(c)(2). Our holding centers on the facts of this case. As the sentencing judge emphasized, Dyer chose to download and frequently use LimeWire, a type of peer-to-peer software that creates a shared system of users, and he did so to acquire images of child pornography for his personal collection.[9] He downloaded these files into a "shared" folder that he knew would be made available to others. He did so for two years and gave no indication to Agents Lechner and Pritchard that he would have stopped had he not been arrested. He knew how to turn off the "sharing" feature of LimeWire and prevent other users from accessing these features, but he did not, at any point, make an effort to do so. By his actions, Dyer took deliberate steps to become part of a virtual community of consumers of child pornography who shared images to enlarge their own collections. Our holding that these acts showed an "intent to traffic" likewise comports with the holdings of other circuits on similar fact patterns. See United States v. Groenendal, 557 F.3d 419, 423-24 (6th Cir. 2009) (holding that the defendant engaged in trafficking

---

[9] We have previously discussed LimeWire's functions at length. LimeWire "is a peer-to-peer file sharing application that connects users who wish to share data files with one another." Lewis, 554 F.3d at 211. When a user downloads LimeWire, the program creates a new folder on his computer where any files downloaded from LimeWire will be saved. LimeWire designates this as a "shared" folder, meaning that its contents will automatically be available to other users. Users can locate and download these files free of charge by entering search terms describing the desired content. When a user downloads a copy of the file, LimeWire saves it in the user's "shared" folder. Id. at 211.

under § 2G2.4(c)(2) when he posted images online to child pornography-trading group); Todd, 100 F. App'x at 250 (finding that "[b]y downloading the images and making them accessible to others," defendant became eligible for sentencing pursuant to § 2G2.4(c)(2)).[10]

To be clear, we do not today reach the abstract issue of whether any LimeWire user who downloaded child pornography could have been sentenced under § 2G2.4(c)(2) because of LimeWire's inherent file-sharing features and purposes. Dyer, by his own admission, was differently situated from an unwitting LimeWire user who failed to realize that by downloading files, he was also saving them to a "shared," universally accessible folder on his own computer. On the facts of this case, the district court was correct to conclude that Dyer's conduct warranted the application of § 2G2.4(c)(2).

III.

Finally, Dyer asserts that the district court relied upon Agent Lechner's testimony before a grand jury to conclude that Dyer knew that he could have made child pornography files unavailable to

_____

[10]  Moreover, these facts would be sufficient for us to find an intent to traffic even if § 2G2.4(c)(2) were read to require specific intent. Dyer's long-term, purposeful use of LimeWire, his deliberate failure to turn off the file-sharing function, and his awareness that other users could download child pornography from his "shared" folder could reasonably be found to amount to a specific intent to share these images with other users, not just knowledge that such a result was the likely consequence of his actions.

-26-

other LimeWire users by transferring the files to another location. This, Dyer claims, violated his Confrontation Clause rights because the grand jury testimony was never part of the record and because he had no chance to challenge that testimony during the sentencing hearing.

This argument lacks merit, not least because the Confrontation Clause does not apply at sentencing. <u>See</u> <u>United States</u> v. <u>Luciano</u>, 414 F.3d 174, 178-79 (1st Cir. 2005).

Further, Dyer failed to raise this argument before the district court, and any claim would therefore have to rise to the level of plain error to warrant reversal. <u>See</u> <u>United States</u> v. <u>Antonakopoulos</u>, 399 F.3d 68, 77 (1st Cir. 2005). There is no possibility of plain error in this case. Dyer presents no evidence that the district court relied upon Lechner's grand jury testimony. Moreover, Dyer's counsel effectively cross-examined Agent Lechner about Dyer's understanding of file-sharing at the sentencing hearing. Beyond this, the district court's conclusion that Dyer knew he could have disabled the sharing feature is supported by a number of documents throughout the record, including the government's Exhibit A at sentencing. That exhibit, in fact, explicitly summarized Agent Lechner's conclusion from his interview with Dyer that Dyer knew "you would have to physically move the file to another location to make it unavailable for sharing."

The sentence is <u>affirmed</u>.

**-Concurring and Dissent Opinion Follows-**

**TORRUELLA**, <u>Circuit Judge</u> (Concurring in part and **Dissenting in part)**. I dissent from the majority's conclusion that Appellant Mark David Dyer ("Dyer") was properly sentenced under U.S.S.G. § 2G2.4(c)(2) for possession of child pornography with intent to traffic. I write separately to state my conclusion that § 2G2.4(c)(2) requires specific intent to traffic in child pornography and to note that the facts of this case fail to establish that Dyer exhibited specific intent to traffic in child pornography. I join the majority in rejecting Dyer's claim that the sentencing court violated his Sixth Amendment right to confront the witnesses presented against him.

## I. U.S.S.G. § 2G2.4(c)(2) requires specific intent

The determination of the sentence that should be applied to Dyer's conviction for possession of child pornography hinges upon an interpretation of the term "intent to traffic" within the purview of § 2G2.4(c)(2). The majority interprets the term "intent to traffic" to require general intent in the sense of knowledge, and not specific or purposeful intent. I respectfully disagree with this interpretation.

During the sentencing proceedings Dyer argued that he had no intention to distribute the images he possessed and that he did not have "an actual intention for anybody else to receive those images." The government, on the other hand, contended that Dyer possessed the images with intent to traffic. On the basis of

Dyer's arguments and taking into consideration the government's position, the district court concluded that Dyer's actions met the requirements of § 2G2.4(c)(2).[1]  On appeal, Dyer argues that the government failed to show that he acted with specific intent to traffic in child pornography and the government has not contested Dyer's assertion that § 2G2.4(c)(2) requires specific intent.

As a threshold matter, the majority claims that Dyer has waived the argument that § 2G2.4(c)(2) requires the government to prove that he acted with specific intent to traffic in child pornography.  The majority's attempt to justify the application of plain error review in this case fails not the least because the record shows that Dyer has argued that he lacked actual or specific intent, but because it is clear that the government never argued that § 2G2.4(c)(2) requires general intent to traffic.  Thus, the government never put the district court in position to decide whether general intent suffices to apply § 2G2.4(c)(2).  The majority therefore errs when it faults Dyer for not developing his

---

[1]    The majority underscores the fact that the sentencing court never interpreted the term intent within the purview of § 2G2.4 (c)(2).  The majority also concludes that the district court did not plainly err when it concluded that Dyer's actions met the Guideline's intent requirements.  In so concluding, the majority assumes that the district court inferred a general intent requirement from § 2G2.4(c)(2).  However, in my view, the government's failure to argue that general intent suffices in this case, reveals that the district court interpreted § 2G2.4(c)(2) in light of Dyer's argument that he lacked actual or specific intent to traffic.  The district court therefore did not hold, as the majority does today, that general intent suffices to sentence Dyer under § 2G2.4(c)(2).

specific intent argument, even though Dyer has argued that he lacked specific intent and the government never claimed that general intent suffices to apply § 2G2.4(c)(2). I therefore cannot partake in the majority's assertion that this court's interpretation of the mens rea required by § 2G2.4(c)(2) is controlled by plain error analysis.

The distinction between general and specific intent is sometimes difficult and at times elusive. See United States v. Bailey, 444 U.S. 394, 403 (1980)(acknowledging the difficulty courts face in defining the mens rea required for a particular crime and discussing the different interpretations of general and specific intent). But it is critically important in a case like this where the sentence to be imposed on one convicted of possessing child pornography depends on the state of mind with which he possessed said material.[2]

---

[2] The majority argues that the distinction between specific and general intent is not critical in this case because we are not concerned with defining the elements of a crime to separate wrongful and innocent conduct. The majority further suggests that the leeway sentencing judges enjoy in considering past uncharged conduct bolsters the conclusion that general intent satisfies the mens rea required by § 2G2.4(c)(2). I fail to ascertain why we should disregard the distinction between specific and general intent when we interpret the mens rea established by the Sentencing Guidelines. This distinction is crucial in this case because the less culpable conduct of possession bleeds into the more serious conduct of trafficking on the basis of criminal intent. Bearing in mind that our interpretative task in this case requires us to tread the waters of the "relation between some mental element and punishment for a harmful act," Morissette v. United States, 342 U.S. 246, 250-51 (1952), it is crucial to carefully scrutinize the level of culpability the Sentencing Guidelines prescribe.

A specific intent crime is one "committed voluntarily and purposely with the specific intent to do something the law forbids." United States v. Blair, 54 F.3d 639, 642 (10th Cir. 1995)(internal quotation marks omitted). It requires more than a knowing violation of the law. United States v. Kimes, 246 F.3d 800, 806 (6th Cir. 2001). The defendant must act with a bad purpose or with the objective of committing the act prohibited by the law. See Blair, 54 F.3d at 642; United States v. Kleinbart, 27 F.3d 586, 592 n.4 (D.C. Cir. 1994). In contrast, a general intent crime requires the knowing commission of an unlawful act. Kleinbart, 27 F.3d at 807. The defendant must act "voluntarily and intentionally, and not because of mistake, inadvertence or accident." Blair, 54 F.3d at 642.

The majority provides several arguments to support its conclusion that the term "intent to traffic" under § 2G2.4(c)(2) requires general intent. The majority claims that the Sentencing Commission chose not to use language that would require specific intent and that both the legislative history of the panoply of statutes that criminalize distribution and trafficking of child pornography, and the "general considerations" of criminal intent support the conclusion that § 2G2.4(c)(2) requires general as opposed to specific intent. Regrettably, the majority misapprehends the text of the Guidelines, ignores their clear mandate, and misapplies the "general considerations" of criminal law and intent.

-32-

First, the plain language of § 2G2.4(c)(2) reveals that the Commission required specific intent in order to find that one convicted for possession of child pornography should be sentenced under U.S.S.G. § 2G2.2, which is the trafficking Guideline. By employing the term "intent to traffic," the Sentencing Commission chose language that has been interpreted by several of our sister courts to require specific intent. Kimes, 246 F.3d at 808 (explaining that when Congress intends to create a specific intent crime it does so explicitly by employing, for example, the term "with intent to"); see also United States v. Welch, 327 F.3d 1081, 1095 (10th Cir. 2003)(interpreting the Travel Act, 18 U.S.C. § 1952, and holding that by requiring an act with "intent to . . . promote . . . or facilitate the promotion . . . of an unlawful activity," the statute required specific intent or proof that the defendant acted with the objective of promoting some unlawful activity). For example, the federal statute that criminalizes the knowing use of unauthorized access devices "with intent to defraud," 18 U.S.C. § 1029(a)(2), has been interpreted to require specific intent to defraud. United States v. Ismoila, 100 F.3d 380, 387 (5th Cir. 1996).[3] Similarly, in the drug-trafficking

---

[3] The majority errs when it relies on the Eighth Circuit's decision in United States v. Gantos, 817 F.2d 41, 42-43 (8th Cir. 1987) to argue that specific intent is not ordinarily a prerequisite in criminal offenses. The Court in Gantos reviewed a specific intent instruction that defined specific intent as requiring evidence that the defendant knew that his act violated the law and that he purposely intended to violate the law. Relying on the general principle that ordinarily knowledge that an act

-33-

context, we have consistently held that to prove possession with intent to distribute in violation of 21 U.S.C. § 841, the government must establish that the defendant knowingly and intentionally possessed a controlled substance with specific intent to distribute.  United States v. García-Carrasquillo, 483 F.3d 124, 130 (1st Cir. 2007); United States v. López-López, 282 F.3d 1, 19 (1st Cir. 2002).

Additionally, the structure of § 2G2.4(c)(2) and its interaction with § 2G2.2 bolster the conclusion that the Sentencing Commission included a specific intent requirement.  The Commission added § 2G2.4 to address offenses involving possession of child pornography, as distinguished from trafficking offenses which are covered under § 2G2.2.  The Commission also directed that when the offense involves trafficking in child pornography, including possession of said material with intent to traffic, an enhanced sentence should be imposed under the trafficking provisions of § 2G2.2.  U.S.S.G. § 2G2.4(c)2).  Put another way, § 2G2.4(c)(2) allows a sentencing court to apply § 2G2.2 to a defendant who has been convicted for possession of child pornography when the

---

violates the law is not an essential element of the offense, Gantos, 817 F.2d at 43, and mindful of the fact that the criminal law does not require knowledge that an act is illegal, wrong, or blameworthy, United States v. Baker, 807 F.2d 427, 429 (5th Cir. 1986)(citation omitted), the Gantos court rejected the proposed specific intent instruction.  The court thus rejected the proposed instruction on the basis that the statute in controversy did not require knowledge or purpose to violate the law.  But contrary to the majority's assertion, the Gantos court did not hold that specific intent is not ordinarily required in criminal offenses.

government establishes by preponderance of the evidence that the defendant intended to traffic in said material. A requirement of specific intent is thus consistent with the Commission's endeavoring to separate punishment for possession of child pornography from those offenses that involve trafficking in said material. It also guarantees that only those who are more than mere possessors of child pornography are sentenced under § 2G2.2 and its trafficking provisions.

Secondly, I disagree with the majority's assertion that a requirement of general intent better comports with the legislative history of the statutes that criminalize trafficking in child pornography. In the majority's view, the fact that trafficking in child pornography no longer requires proof that the defendant acted with a commercial purpose reveals that motives are irrelevant and that consequently § 2G2.4(c)(2) should be interpreted to require general intent to traffic. In pursuing this argument, the majority conflates the actions that amount to trafficking in child pornography with the mens rea required by the Guidelines. The fact that financial gain or commercial purpose is not necessary to convict an individual for trafficking in child pornography informs our interpretation of the term "traffic" by clarifying the actions that amount to trafficking in child pornography. However, this legislative history does not end our inquiry regarding the mens rea an individual must exhibit to be

deemed to possess child pornography with intent to traffic. We are here concerned with whether the defendant possessed child pornography with intent to traffic, not with whether he was moved by an expectation to recoup a profit. The fact that Congress made trafficking in child pornography a crime regardless of whether the defendant was moved by a commercial purpose is not inconsistent with the interpretation that § 2G2.4(c)(2) requires the government to show that the defendant specifically intended to traffic in child pornography.

Thirdly, in my view, the majority misapplies the general considerations of criminal law when it relies on this court's decision in United States v. Tobin, 552 F.3d 29, 46 (1st Cir. 2009) to hold that § 2G2.4(c)(2) requires general intent. Tobin, the majority argues, allows this court to rest on the default assumption or "general consideration" that intent in most crimes means general intent. I disagree. In pursuing this argument, the majority fails to ascertain that although general intent has been held sufficient to meet the mens rea requirement for most crimes, this general principle is ordinarily applied where the criminal statute is silent as to the mens rea required. See, e.g., Carter v. United States, 530 U.S. 255 (2000) (concluding that the presumption in favor of scienter only required proof of general intent in federal bank robbery statute that was silent as to the mens rea requirement); Bailey, 444 U.S. at 406-08 (inferring a

general intent requirement from federal statute criminalizing escape from federal custody in the absence of language or legislative history regarding the mens rea required for conviction). But where, as here, the plain language of the statutory text includes a mens rea requirement, we need not resort to the general considerations invoked by the majority.

Although general intent may generally be sufficient in most crimes to support a conviction, Bailey, 444 U.S. at 408, we are dealing in this case with a narrow category of crimes that require a heightened level of mental culpability. Therefore, the principle that ordinarily general intent suffices for most crimes does not control our inquiry in this case.

Finally, the majority errs in its reliance on dicta from Tobin to conclude that trafficking in child pornography is inherently bad conduct and therefore knowledge of the consequences of such action satisfies the Guidelines' mens rea requirement. In Tobin, this court held that a statute which criminalized the making of repeated phone calls with intent to harass required specific intent to harass and further intimated that general intent could be required by a different section of said statute that criminalized obscene calls or calls that involved child pornography. 552 F.3d at 33. The Tobin court was only concerned with interpreting the statute's section that criminalized the making of repeated phone calls with intent to harass. Therefore, any expressions related to

the making of obscene calls or calls involving child pornography constitute dicta that does not bind the court in the present case. In addition, the court in Tobin reached its determination by interpreting the statute as a whole and differentiating between the harms posed by the types of conduct prohibited under it. The court, however, did not rule that when a statute criminalizes actions related to child pornography it should be interpreted to require knowledge as opposed to purpose. Tobin is therefore scant authority for the majority's interpretation that §2G2.4(c)(2) only requires general intent.

In interpreting § 2G2.4(c)(2) I am guided by the principle that the statute's plain language is the starting point of our interpretation. Staples v. United States, 511 U.S. 600, 605 (1994)(stating that the language of a criminal statute is the starting point of the court's interpretation of a criminal statute); Carter, 530 U.S. at 271 (stating that the canons of statutory interpretation require courts to first examine the statutory text). As has been seen, by employing the words "with intent to traffic," the Commission chose language that has been interpreted to require specific intent and the structure and purposes of the Guidelines support this conclusion. I would therefore hold that in order to sentence one convicted for possession of child pornography pursuant to § 2G2.4(c)(2), the government must prove beyond a reasonable doubt that the defendant

possessed child pornography with specific intent to traffic in said material.

## II. The facts are insufficient to conclude Dyer exhibited specific intent to traffic

Although the term "traffic" is not defined in the Guidelines, it encompasses both buying and selling commodities for money or exchanging commodities by barter. See United States v. Paul, 274 F.3d 155, 163 (5th Cir. 2001). Evidence that a defendant traded pictures online or sent and received images via the Internet has been found sufficient to constitute trafficking under § 2G2.4 (c)(2). United States v. Bender, 290 F.3d 1279, 1285 (11th Cir. 2002)(convicted defendant admitted that he had traded pictures online, and the evidence showed that he had sent child pornographic images to other users online); United States v. Johnson, 221 F.3d 83, 98 (2d Cir. 2000)(finding that trafficking occurred where defendant admitted he sent and received child pornography over the Internet). Trafficking has also been found where the defendant not only downloaded child pornography onto his computer, but also uploaded child pornographic images in order to join a pornographic website, United States v. Groenendal, 557 F.3d 419, 421; 424 (6th Cir. 2009), and where defendant admitted he traded pornography over the Internet and the evidence showed he sent explicit photographs to another individual and agreed to exchange videos with an undercover agent, United States v. Jordan, 111 Fed. Appx. 65, 68 (2d Cir. 2004).

These cases show that in order to find that a defendant trafficked in child pornography, the government must prove that the defendant engaged in affirmative actions to exchange or barter in child pornography. These actions include, for example, receiving and sending child pornography. See United States v. Parmelee, 319 F.3d 583, 594 (applying § 2G2.4(c)(2) to a defendant convicted for possession of child pornography where the evidence established that defendant stored pornographic images on recordable compact discs which he intended to barter with other people for programs or services).

The facts of this case show that Dyer used the file-sharing application LimeWire to download child pornography; he knew that when files were downloaded from LimeWire the program automatically saved the files in a shared folder that was potentially available to other users; and he failed to remove the files to make them unavailable for sharing. It is thus clear that Dyer knowingly downloaded child pornography through LimeWire and that he understood that LimeWire automatically saves images in a shared folder. But these actions do not show he purposely sought to trade, exchange, or barter in child pornography or that he specifically intended to engage in the sort of activities that have been held to amount to trafficking in child pornography.

The critical factor to discern whether Dyer intended to traffic child pornography via LimeWire is not whether he had

knowledge of how LimeWire works in terms of file-sharing, but rather whether by using LimeWire to download child pornography Dyer intended to traffic in said items. We lack proof that Dyer used LimeWire with the objective of offering the images for barter or exchange with others. We similarly lack evidence that Dyer sought to engage in an active exchange of images of child pornography with the purpose to receive further images in return. Moreover, the evidence actually established that Dyer had not traded any images over the Internet via e-mail, chat-rooms, bulletin boards, or newsgroups.

Absent proof that Dyer allowed LimeWire to keep images in a shared folder with the purpose of engaging in an exchange of images, I cannot partake in the majority's conclusion that the sentencing court properly applied § 2G2.4(c)(2). Specific intent in this case is inextricably bound to affirmative actions to traffic in child pornography. In my view, use of LimeWire with knowledge of its automatic file-sharing features and Dyer's failure to disable the sharing feature is insufficient to conclude that Dyer exhibited specific intent to traffic absent evidence that he took additional actions to offer the images for exchange with the expectation that he would receive further commodities in return.

I also note my concern with the majority's efforts to equate intent to share with intent to traffic. Although the majority claims it is not holding that mere use of LimeWire amounts

-41-

to trafficking in child pornography, its interpretation that the "crucial acts separating possession from trafficking involve intent to share images of child pornography with others," threatens to do just that. While use of a file-sharing program may provide circumstantial evidence of intent to traffic, a finding that there is specific intent to traffic requires more than knowing use of a file-sharing program. It requires proof that the defendant intended to engage in an exchange of commodities or goods with the expectation to receive some type of commodity in return. The inference that sharing is tantamount to trafficking lowers the threshold of the actions that have been held to amount to trafficking and leads to the imposition of criminal liability for trafficking where the user has not exchanged commodities by barter.

For these reasons, I respectfully dissent from the determination that Dyer was correctly sentenced under § 2G2.4 (c)(2).

### III. Confrontation Clause

Finally, I join the majority in rejecting Dyer's claim that the sentencing court relied on Agent Lechner's grand jury testimony, thereby depriving Dyer of his right to cross-examine Agent Lechner regarding his grand jury testimony. We have to evaluate this claim under the plain error standard of review because Dyer failed to raise the Confrontation Clause issue before the district court. United States v. González-Castillo, 562 F.3d

-42-

80, 82 (1st Cir. 2009).  As the majority states, there is no evidence in the record that the sentencing court relied on Lechner's grand jury testimony without allowing Dyer to elucidate this testimony at sentencing.  Absent an obvious or clear error by the sentencing court, Dyer's claim that the sentencing court deprived him of his right to confront Agent Lechner regarding his grand jury testimony must therefore fail.

### IV. Conclusions

I dissent from the majority's conclusion that the district court properly sentenced Dyer pursuant to § 2G2.4(c)(2). I would hold that § 2G2.4(c)(2) requires specific intent to traffic and that the facts of this case fail to show that Dyer exhibited specific intent to traffic in child pornography.  I concur in the determination that the district court did not violate Dyer's Sixth Amendment right to confront the witnesses presented against him.