# United States Court of Appeals
## For the First Circuit

No. 08-1340

UNITED STATES OF AMERICA,

Appellant,

v.

JAMES TOBIN,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before
Lynch, Chief Judge,
Boudin and Stahl, Circuit Judges.

Andrew Levchuk, Department of Justice, Criminal Division, Public Integrity Section, with whom William M. Welch II, Chief, Department of Justice, Criminal Division, Public Integrity Section, Nicholas Marsh, Department of Justice, Criminal Division, Public Integrity Section, Michael DuBose, Chief, Department of Justice, Criminal Division, Computer Crime and Intellectual Property Section, and Albert Rees, Department of Justice, Criminal Division, Computer Crime and Intellectual Property Section, were on brief for appellant.
John G. Kester with whom Dane H. Butswinkas, Tobin J. Romero, Jonathan Kravis and Williams & Connolly LLP were on brief for appellee.

January 7, 2009

**BOUDIN**, <u>Circuit Judge</u>.  The government's appeal in this case presents the question of whether 47 U.S.C. § 223(a)(1)(D)(2000), which criminalizes "mak[ing] or caus[ing] the telephone of another repeatedly or continuously to ring, with intent to harass any person at the called number," requires a subjective purpose to harass, or whether it suffices that the caller can foresee that the victim will feel abused or distressed. The factual and procedural background can be briefly summarized.

James Tobin served as New England Regional Director of the Republican National Committee and Regional Political Director for the National Republican Senatorial Committee.  During a visit to New Hampshire prior to the 2002 general election, Tobin spoke with Charles McGee, Executive Director of the New Hampshire Republican State Committee, who proposed a scheme to disrupt the New Hampshire Democratic Party's operations on Election day.

Tobin gave McGee the contact details of an acquaintance, Allen Raymond, who owned a telephone business which served candidates and campaigns.  Tobin called Raymond to tell him to expect McGee's call.  McGee and Raymond subsequently spoke and e-mailed on several occasions to plan how telemarketers would tie up the phone lines of Democratic Party offices and the firefighters union in order to disrupt their efforts to provide free rides to the polls.

On Election Day, this phone jamming scheme was called off by John Dowd, McGee's direct superior. But before Dowd's instructions were fully communicated, nearly 1,000 telephone calls were placed to five Democratic Party numbers and a firefighters union, and the operation successfully jammed the recipients' telephone lines for two hours. The evident purpose of the endeavor was to paralyze the Democratic get-out-the-vote efforts by tying up their telephones.

Raymond and McGee both pled guilty to violating 47 U.S.C. § 223(a)(1)(C)(2000), which focuses on completed phone calls rather than ringing.[1] Tobin was tried in December 2005 on several different counts. The jury convicted Tobin of one count of conspiracy, 18 U.S.C. § 371 (2000), and one count of aiding and abetting, id. at § 2, both related to the making of repeated harassing phone calls, 47 U.S.C. § 223(a)(1)(D); but the jury acquitted him of conspiring to interfere with constitutional rights, 18 U.S.C. § 241. He was sentenced to ten months in jail.

Tobin appealed, arguing that the jury had been erroneously instructed and claiming that an acquittal should have been ordered based on insufficient evidence. We agreed that the

---

[1]This provision punishes one who "makes a telephone call or utilizes a telecommunications device, whether or not conversation or communication ensues, without disclosing his identity and with intent to annoy, abuse, threaten, or harass any person at the called number or who receives the communications." The government indicted Tobin on this count as well but voluntarily dismissed it during Tobin's trial.

instruction had been overbroad--in effect, licensing conviction wherever there was "any repeat calling done in bad faith." United States v. Tobin, 480 F.3d 53, 58 (1st Cir. 2007). But we declined to order an acquittal, noting that a critical issue of statutory construction, not fully developed by either side on appeal, would likely affect whether Tobin could be prosecuted. The conviction was vacated and the case remanded to the district court.

On remand, the district judge considered, as the remand contemplated, whether it suffices under subsection (D) to know that the called party will feel abused or distressed. Tobin, 480 F.3d at 61-62. To the contrary, the district judge concluded that "a specific purpose to cause emotional upset in a person at the telephone number called" was required and, finding that the government had insufficient evidence to meet this mens rea requirement, entered a judgment of acquittal. United States v. Tobin, 545 F. Supp. 2d 189, 192 (D.N.H. 2008).

The government now appeals, arguing that section 223(a)(1)(D)'s "intent to harass any person at the called number" does not require purpose but only knowledge of probable consequences. Tobin, who defends the district court's reading, also offers a threshold objection: he notes that the government may not appeal a criminal case "where the double jeopardy clause of the United States Constitution prohibits further prosecution," 18 U.S.C. § 3731, and argues that this is just such a case.

-4-

Tobin does not argue, nor could he under governing precedent,[2] that double jeopardy protection attached immediately upon this court's reversal of his trial conviction and therefore barred a remand for further proceedings. Rather, Tobin relies on the district court's judgment of acquittal on remand as the event that triggered protection against further proceedings. Tobin argues that once a district court has entered a judgment of acquittal, double jeopardy bars the government's appeal.

Double jeopardy jurisprudence is as much a creature of history and judicial precedent as of logic. One established rule is that an acquittal of a defendant because the evidence offered by the prosecution is insufficient, ordered by the judge after the jury has been empaneled, effectively bars an appeal even though a jury has never spoken. Smith v. Massachusetts, 543 U.S. 462 (2005). But in this case, the district court's "acquittal" was before any new impanelment, so another established rule disposes of Tobin's argument here: jeopardy (here, after a vacatur of a conviction and a remand) does not attach until a jury has been sworn.

---

[2]See United States v. Carpenter, 494 F.3d 13, 26 (1st Cir. 2007)("where the first conviction was vacated for legal error, not insufficiency of evidence, the concept of continuing jeopardy rules out a double jeopardy claim based on purported insufficiency of evidence at the first trial") (internal quotation marks and citation omitted). Accord United States v. Scott, 437 U.S. 82, 90-91 (1978); United States v. Recio, 371 F.3d 1093, 1106 (9th Cir. 2004); United States v. Pearl, 324 F.3d 1210, 1214 (10th Cir. 2003).

In Serfass v. United States, 420 U.S. 377, 392 (1975) (internal citations omitted)(emphasis added), the Supreme Court declared:

> It is, of course, settled that "a verdict of acquittal . . . is a bar to a subsequent prosecution for the same offence." But the language of cases in which we have held that there can be no appeal from, or further prosecution after, an "acquittal" cannot be divorced from the procedural context in which the action so characterized was taken. The word itself has no talismanic quality for purposes of the Double Jeopardy Clause. In particular, it has no significance in this context unless jeopardy has once attached and an accused has been subjected to the risk of conviction.

Applying this principle, Serfass explained: "[T]he courts have found it useful to define a point in criminal proceedings at which the constitutional purposes and policies are implicated by resort to the concept of 'attachment of jeopardy.' In the case of a jury trial, jeopardy attaches when a jury is empaneled and sworn." Serfass, 420 U.S. at 388 (citation omitted). This is mechanical and perhaps arbitrary, but it is the line that the Supreme Court has drawn and the circuits have followed. See, e.g., United States v. Frye, 372 F.3d 729, 734 (5th Cir. 2004); United States v. Dilg, 700 F.2d 620, 624 n.2 (11th Cir. 1983).

Ordinarily district judges in a criminal jury case have no occasion to weigh the evidence before a jury is impaneled. They do sometimes dismiss indictments (e.g., because of alleged insufficiency of the charge), see United States v. McInnis, 601

-6-

F.2d 1319, 1322-23 (5th Cir. 1979); <u>United States</u> v. <u>Greater Blouse, Skirt & Neckwear Contractors Ass'n</u>, 228 F. Supp. 483, 486-87 (S.D.N.Y. 1964), but double jeopardy does not in such cases bar appeal by the government--jeopardy never having attached. <u>See Serfass</u>, 420 U.S. at 389. Similarly, despite the use of the term "acquittal," jeopardy had not yet attached here when the district judge acted;[3] of course, jeopardy had attached when the original jury was impaneled but the remand had wiped that slate clean.

The procedure followed by the district judge was perhaps unorthodox since acquittals are normally ordered only after evidence has been presented, but the government does not complain of that; nor does it claim in its brief either that a reasonable jury could have convicted on the present evidence under the subjective-purpose reading the judge gave to the statute, or that it had other evidence unknown to the district judge. It merely disputes the district judge's reading of the statute, just as Tobin did on the prior appeal.

This brings us to the merits of the appeal. "Few areas of criminal law pose more difficulty than the proper definition of the <u>mens</u> <u>rea</u> required for any particular crime." <u>United States</u> v. <u>Bailey</u>, 444 U.S. 394, 403 (1980). We review pure questions of

_____

[3]Even after jeopardy has attached (or, in this case, reattached), just what constitutes an "acquittal" by the trial judge in a jury case does not necessarily depend on the label chosen by the judge. <u>See</u> <u>Smith</u>, 543 U.S. at 468; <u>Gonzalez</u> v. <u>Justices of Mun. Court of Boston</u>, 420 F.3d 5 (1st Cir. 2005)

statutory interpretation de novo, United States v. Jaca-Nazario, 521 F.3d 50, 56 (1st Cir. 2008), and properly begin with the statutory language, id., but in this instance the wording of the critical phrase--"with intent to harass any person at the called number" is inconclusive.

Although the word "intent" can often mean with "knowledge" that a particular result will follow, it sometimes instead requires a "purpose" to bring about a specific end. E.g., United States v. Houlihan, 937 F. Supp. 75, 76 (D. Mass. 1996) ("intent to retaliate" in 18 U.S.C. § 1513 requires proof either of "sole and abiding purpose" or "purpose . . . mixed in with other purposes"). To avoid this confusion, the ALI Model Penal Code chose to avoid the term "intent," identifying knowledge or purpose as the more exact identifiers. See Wechsler, The Challenge of a Model Penal Code, 65 Harv. L. Rev. 1097 (1952). Legislatures, however, have remained attached to the term.

Nor does the structure of section 223(a)(1)(D) clearly delineate just what state of mind Congress sought to specify as the scienter requirement here. The other subsections are variously worded; but the first three--(A), (B) and (C)--involve suspicious or even malign conduct (obscene calls, child pornography, non-disclosure of identity). Thus, it thus makes sense to read their intent requirement as satisfied by mere knowledge of consequences;

by contrast, causing a phone to ring multiple times is not inherently vicious.[4]

The fifth provision, (E), is addressed primarily to one who "makes repeated telephone calls . . . during which conversation ensues, solely to harass," and (interpolating "in order to" from context) this provision does appear to look to purpose rather than knowledge. But the inference for subsection (D) is uncertain: one could stress in Tobin's favor that, as with ringing, the conduct is not necessarily wicked, or one could contrast the "solely to" phrasing with (D) and draw an inference against Tobin's position. Neither inference is clearly stronger than the opposite.

Finally, legislative history is not helpful. The main aim of the statute was to criminalize phone calls placed to harass or frighten the receiver--in particular war veterans and their families. E.g., 114 Cong. Rec. 4933 (1968). Concern over obscene calls to women was also voiced. See, e.g., 111 Cong. Rec. 26477 (1965). Phone jamming does not seem to have been a principal concern and the few scattered references to phone lines being tied up involved what appears to have been purposive harassment. E.g., id. at 26,476, 26,477; 114 Cong. Rec. 4933.

---

[4]Subsection (A) condemns calls that are obscene or involve child pornography made "with intent to annoy, abuse, threaten, or harass another person" and knowledge in such cases has been found sufficient. See ApolloMedia Corp. v. Reno, 19 F. Supp. 2d 1081, 1096 (N.D. Cal. 1998); see also United States v. Eckhard, 466 F.3d 938, 947-48 (11th Cir. 2006) (rejecting defendant's objection that the jury was not instructed to require specific intent).

We are therefore cast back on more general considerations. For most crimes "intent" in the sense of knowledge is enough, see Bailey, 444 U.S. at 404; for example, when a defendant points a gun at the victim's head and pulls the trigger, the knowledge that death will result is ordinarily sufficient. But the distinction sometimes matters; this can be especially so for conduct which may be defensible only if done for a benevolent purpose (a doctor swabbing a wound may foreseeably cause considerable pain) or where bad purpose magnifies the harm (e.g., racially motivated crimes).

There is nothing inherently wicked or even suspect about multiple phone calls, even when the repeated phone calls and resultant ringing are annoying or distressing to someone who refuses to answer. Imagine repeated calls to warn that a fire is sweeping the neighborhood. Or, suppose repeated calls to sell a product or to solicit a contribution--where ringing is suffered rather than taking the phone off the hook for all calls. Nothing in subsection (D) suggests that it was designed to mediate such difficult problems.

The government assured us at oral argument that it can distinguish such cases. But we are not willing to construe over-generously a criminal statute to cover cases that should not be made criminal in the hope (usually but not invariably borne out) that prosecutors will exercise restraint in the interest of common

sense.  The district court's original bad-faith instruction showed full awareness of the problem when it interpolated a bad faith requirement, but its solution was not in the statute (and itself turned on a relatively vague concept).

By contrast, reading the statute to require a "purpose" to harass solves the problem.  A number of states, although by no means all, do construe their own harassment statutes in this fashion, e.g., Galloway v. State, 781 A.2d 851, 870-71 (Md. 2001); it conforms with our own reading of subsection (E) which deals with the counterpart problem where the phone is answered rather than left to ring; and while it does not extend the statute to some thoroughly bad conduct--such as the scheme in this case--a proper statute could easily be written to do so.

Some states have statutes that forbid deliberate disrupting of communication, e.g., Me. Rev. Stat. Ann. tit. 5, § 4684-B(2) (2008).  But not all states have such laws and, given the integrated character of the national telephone network, it is perhaps surprising that no federal statute provides similar protection.  The apt solution is not to stretch out of shape a law about harassment by ringing, but for Congress to prescribe such deliberate interference by whatever means.

We need not invoke the rule of lenity, see United States v.  Godin, 534 F.3d 51, 61 (1st Cir. 2008), for this is not a typical case of ultimate ambiguity which requires choosing the more

lenient reading.  Rather, the misfit between the statute and the conduct is obvious, but alternative constructions can fairly be considered.  It is only when the implications of the broader reading are thought through that the choice between the two readings becomes clear--not to achieve undeserved leniency in this case, but to avoid a construction that would be affirmatively dangerous in others.

If the government claimed that it had evidence that Tobin had a purpose to harass, it would likely be entitled to a trial on the issue--subject always to the risk of directed verdict after it closed if the evidence were insufficient.  But the government has conceded in its brief--and plausibly so--"that harassment was not [Tobin's] subjective purpose," and we accept its concession that assuming the statute requires proof of purpose (and we so hold), "Tobin prevails, and this case ends."

Affirmed.