LYNCH, Chief Judge.
At issue is the meaning and application of a 2003 Sentencing Guideline for possessing child pornography, § 2G2.4(e)(2), which instructed sentencing judges to apply the stiffer penalties for trafficking in child pornography cases “[i]f the offense involved trafficking in material involving the sexual exploitation of a minor ... including ... possessing material involving the sexual exploitation of a minor with intent to traffic.” U.S.S.G. § 2G2.4(c)(2). The issue is one of first impression for this circuit. The defendant, Mark David Dyer, primarily argues that the sentencing judge erred in determining that the evidence sufficed to establish he had an intent to traffic in child pornography under § 2G2.4(c)(2) of the 2003 Sentencing Guidelines, thus adding a minimum of thirteen additional months to the defendant’s Sentencing Guidelines range. Despite this, the trial judge exercised his discretion to sentence below the range, and sentenced Dyer to sixty months in prison, followed by eight years of supervised release.
Dyer pleaded guilty to possession of child pornography, in violation of 18 U.S.C. § 2252(A) (a)(5) (B). The original guideline range for the total offense level under possession was fifty-seven to seventy-one months; the application of the trafficking guideline made it seventy to eighty-seven months. Dyer argues on appeal that the district court wrongly interpreted and applied § 2G2.4(c)(2), the trafficking cross-reference.
He also argues that the district court relied upon ex parte grand jury testimony to reach its factual conclusions and thereby violated his rights under the Confrontation Clause.
We disagree with both arguments and affirm his sentence based on the facts of this case.
I.
The basic facts are undisputed. On June 4, 2004, agents of the Federal Bureau of Investigation (FBI) executed a warrant to search the Brunswick, Maine residence of Mark David Dyer. The agents seized a computer hard drive and ten compact disks (CDs), all of which were later found *522 to contain numerous images of child pornography.
Later that day, Dyer consented to an interview with Special Agents James Lech-ner and Paul Pritchard. Dyer told them that he owned the computer and the CDs and that no one else had access to them. The CDs, Dyer conceded, contained images that would likely qualify as child pornography. He admitted that he had downloaded what he estimated to be several thousand nude pictures of twelve — or thirteen-year-old girls, had saved these images on his computer, and had burned them onto CDs. He obtained these images, he told Agents Lechner and Pritchard, either by temporarily joining subscription-only websites or through the use of the Lime-Wire peer-to-peer file-sharing program. Dyer used these methods once or twice a week to obtain new pornographic images of prepubescent girls aged fourteen or younger. When asked about a notebook seized during the search, Dyer explained that he had used it to list common keywords like “pedo,” “teen,” and “pre-teen” that he entered into LimeWire to find new files.
Dyer had used LimeWire for two years and explained his understanding of the program to Agents Lechner and Pritchard. He knew, he said, that when he downloaded photographs or videos from LimeWire, the program saved the files in a “Completed Folder” on his hard drive. This folder, Dyer noted, was automatically treated as a “shared” folder by the LimeWire software. Dyer knew that anything he downloaded would therefore be available for other Li-meWire users to keyword search and download. He also knew how to stop the material from getting to other LimeWire users. To prevent this file folder from being shared with other users, Dyer added, he would have had to transfer the file to another location on his hard drive. He had not done so.
Forensic analysis of Dyer’s computer and CDs revealed several hundred images of what appeared to be child pornography. When the National Center for Missing and Exploited Children (NCMEC) analyzed the images at the FBI’s request, it determined that Dyer had downloaded 952 photographs and four videos featuring known and actual child victims of sexual exploitation.
The most graphic of these images was a series featuring a single prepubescent girl. The NCMEC confirmed, and Dyer did not dispute, that the girl featured in these images was an actual child and a known victim of sexual abuse. One of the photographs in the series showed an adult male urinating on the young girl. In another photograph, the girl had been posed on a bed naked, with the words “cut me,” “hurt me,” and “slut” written across her torso. The image also showed someone holding a knife near her vagina. This image was saved under the file name “PTHC, Ultra Hard Pedo Child Porn Pedofilia (New) 061.JPEG.” Dyer had stored the entire series featuring the girl in the “shared” folder on his computer hard drive, making it available to all LimeWire users.
Other files in Dyer’s “shared” folder had titles such as “pthc — kely & camila07 young girls rub pussies together.jpg”; many included the acronym “pthc,” standing for “pre-teen hard-core,” in the title.
An August 22, 2007 indictment charged Dyer with knowingly possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).[1] On November 28, 2007, Dyer pleaded guilty to this charge in the federal district court of Maine.
*523 The court applied the 2003 version of the Sentencing Guidelines in order to avoid ex post facto considerations. The pre-sen-tence report (PSR) submitted to the district court calculated a total offense level of 25 under the 2003 Sentencing Guidelines. The PSR used U.S.S.G. § 2G2.4, which applied to defendants convicted of possession of child pornography and carried a base offense level of 15, and adjusted the sentence upwards to reflect a number of relevant enhancements.[2]
At the pre-sentence conference, the government argued that the PSR should have applied the trafficking cross-reference in U.S.S.G. § 2G2.4(c)(2) and should have therefore used the trafficking provision rather than the possession provision to calculate Dyer’s base offense level for sentencing. The sentence enhancement under the trafficking cross-reference should have been imposed, the government contended, because Dyer had manifested an intent to distribute the child pornography on his computer by making it accessible to other LimeWire users. Dyer argued that leaving files on a shared computer folder did not qualify as “trafficking” and that, in any event, there was insufficient evidence that he had intended to traffic in child pornography.[3]
At the sentencing hearing on March 13, 2008, Agent Lechner testified and was cross-examined regarding his interview with Dyer. Lechner described his role in the search of Dyer’s residence, his subsequent interview with Dyer, and the FBI’s ultimate conclusions regarding the quantity and nature of the images of child pornography discovered on Dyer’s computer and CDs. He testified that Dyer had said during the interview that he understood that the child pornography downloaded onto his shared drive would be made available to other LimeWire users. The government also introduced Lechner’s contemporaneous report of the interview into evidence. The report included Dyer’s admission that he knew how to prevent the files from being shared. He had opted not to disable this feature. Another exhibit displayed the results of the forensic analysis of Dyer’s computer and a selection of the more graphic images discovered in Dyer’s “shared” folder. Dyer did not introduce any evidence at sentencing.
On the basis of this evidence and a Fifth Circuit case involving similar facts, United States v. Todd, 100 Fed.Appx. 248 (5th Cir.2004), the district court applied the trafficking cross-reference in U.S.S.G. § 2G2.4(c)(2). However, it did so on the basis of the specific facts of the case and implicitly rejected the government’s argument that any use of LimeWire would automatically constitute trafficking due to the program’s file-sharing features. “Trafficking,” the sentencing judge noted, included bartering, and Dyer had exhibited an “intent to traffic” by knowingly making images of child pornography available to other LimeWire users. The sentencing judge emphasized the facts essential to this conclusion: Dyer had told Agent Lechner that he knew that any file downloaded from LimeWire would be available *524 to other users; he knew where LimeWire stored the files he downloaded on his computer, and that they could be accessed and downloaded by other LimeWire users; he knew that he could have moved the file to a different location to prevent other users from accessing it; and he had used Lime-Wire for two years, during which he downloaded files and had his own files available for download. These acts, the sentencing judge found, demonstrated an intent to traffic within the meaning of § 2G2.4(c)(2). The sentencing judge also determined that this conclusion was consistent with Congress’s intention to punish those who furthered the market for child pornography more severely, reasoning that file-sharing was qualitatively different from mere possession of files on an inaccessible computer hard drive location.
In calculating Dyer’s sentence, the sentencing judge emphasized that Dyer had pleaded guilty to an exceptionally serious offense that involved the sexual abuse of real children. But the sentencing judge also acknowledged that Dyer had received an honorable discharge from the United States Navy and was a first-time offender who had shown remorse and a willingness to undergo a sex offender treatment program. Dyer’s total offense level under the Guidelines was twenty-seven, which would ordinarily result in a prison sentence of between seventy and eighty-seven months. However, in light of Dyei*’s character and circumstances, the sentencing judge imposed a below-Guidelines sentence of sixty months in prison, followed by eight years of supervised release.
Dyer now appeals this sentence.
II.
A. Interpretation of Guidelines Terms
Dyer’s main argument on appeal is that the facts of his case supported only the application of the guidelines pertaining to possession of child pornography, and not “trafficking.” The district court’s interpretation of the meaning of an “intent to traffic” under § 2G2.4(c)(2) and of the cross-reference are questions of law, which we review de novo. See United States v. Cruz-Rodriguez, 541 F.3d 19, 32 (1st Cir.2008). We review the district judge’s findings of fact for clear error, and the government must prove facts essential to sentencing enhancements by a preponderance of the evidence. Id. at 31 & n. 8.
The issue before us is not whether mere use of LimeWire by one who possesses child pornography shows an intent to traffic simply because LimeWire is a file-sharing program. The government has withdrawn that argument and the district court did not adopt it. Rather, the outcome of this case depends upon the particular facts and not on a per se rule. Dyer’s challenge raises issues of interpretation of both “intent” and “traffic,” but ultimately turns on the facts.
The Guidelines set forth a distinction between “possession” of and “trafficking” in child pornography as those terms are used in U.S.S.G. §§ 2G2.4 and 2G2.4(c)(2). Dyer suggests a series of limitations on the definition of trafficking, which we reject. To define the kind of acts that constitute “trafficking” as opposed to mere possession, we employ ordinary rules of statutory construction. See United States v. Luna-Diaz, 222 F.3d 1, 3-6 (1st Cir.2000) (looking to the text, guideline commentary, statutory context, and use of similar language in criminal statutes to interpret the meaning of a term in U.S.S.G. § 2L1.2); United States v. DeLuca, 17 F.3d 6, 10 (1st Cir.1994) (holding that the Sentencing Guidelines should be interpreted according to principles of statutory construction).
*525 The text of the 2003 Sentencing Guidelines separated sentencing for the possession and trafficking of child pornography into two distinct subsections. Sentencing judges were to apply U.S.S.G. § 2G2.2 to defendants convicted of trafficking in child pornography; receiving, transporting, shipping, or advertising such material; or possessing such material with an intent to traffic. This guideline carried a base offense level of 17. U.S.S.G. § 2G2.2. By contrast, U.S.S.G. § 2G2.4 prescribed a base level of 15 for defendants convicted only of possessing child pornography, subject to the condition we describe next.
The condition is that a cross-reference in the possession guideline, § 2G2.4(c)(2), mandated that “[i]f the offense involved trafficking in material involving the sexual exploitation of a minor (including receiving, transporting, shipping, advertising, or possessing material involving the sexual exploitation of a minor with intent to traffic),” then the sentencing judge was to use § 2G2.2, the trafficking guideline, instead. U.S.S.G. § 2G2.4(c)(2).[4]
As a result, the plain language of § 2G2.4(c)(2) unambiguously extended the trafficking cross-reference both to defendants who actually trafficked in child pornography and to defendants who possessed child pornography with the intent of trafficking but had not yet completed the act. In other words, this trafficking cross-refer-enee, by its terms, could be imposed even absent evidence that others received child pornography from the defendant.
The government needs only to demonstrate by a preponderance of the evidence that a defendant possessed the requisite “intent to traffic.” See, e.g., United States v. Jordan, 111 Fed.Appx. 65, 68 (2d Cir.2004). Dyer unsuccessfully advances limitations, not in the text, on what “intent” means and on what “traffic” means. We, like the Second Circuit in Jordan, reject Dyer’s argument that the cross-reference in § 2G2.4(c)(2) governed only when the government proved that the defendant actually engaged in trafficking and did not merely intend to do so.[5] We also reject Dyer’s argument that the government must show that third parties actually retrieved and downloaded images from defendant’s computer to show that the defendant had an intent to traffic.
First we address the legal arguments about the meaning of the terms “traffic” and “intent”; we then turn to whether, in light of those meanings, the facts sufficed to meet those definitions.
1. Meaning of “Traffic” under § 2G2.4(c)(2)
Because the 2003 Guidelines do not define the term “traffic,” we interpret this word by looking to its commonly accepted meaning. See DeLuca, 17 F.3d at 9. To *526 traffic in something commonly means [t]o “trade or deal in (goods, esp. illicit drugs or other contraband),” Black’s Law Dictionary 1634 (9th ed. 2009), or to engage in “the activity of exchanging commodities by bartering or buying and selling,” Webster’s Third New International Dictionary 2422 (1993).
At oral argument, defendant argued that mere trading or bartering of child pornography is not trafficking. We reject the argument. We also reject the argument that a defendant must expect some financial gain from trafficking. In the context of § 2G2.4(c)(2), a defendant traffics in child pornography if he engaged or intended to engage in an exchange or trade of such images. No financial gain or expectation of financial gain is necessarily required. See United States v. Todd, 100 Fed.Appx. 248, 250 (5th Cir.2004), vacated on other grounds, 543 U.S. 1108, 125 S.Ct. 1039, 160 L.Ed.2d 1031 (2005) (noting that “trafficking” ordinarily means “both buying and selling commodities for money and exchanging commodities by barter”); United States v. Parmelee, 319 F.3d 583, 594 (3d Cir.2003) (observing that “trafficking” under § 2G2.2 includes bartering); United States v. Johnson, 221 F.3d 83, 98 (2d Cir.2000) (same); United States v. Horn, 187 F.3d 781, 791 (8th Cir.1999) (“Section 2G2.2 and the cross reference in § 2G2.4(c)(2) apply when the offense involved the exchange or barter of [child pornography], and not only ... when this material was offered for sale”). These cases confirm that the crucial acts separating mere possession from trafficking involve the intent to share images of child pornography with others, irrespective of financial motive.
This interpretation is also borne out by the legislative history of the 1977 Protection of Children Against Sexual Exploitation Act (Act), which was amended in 1996 to include 18 U.S.C. § 2252A. See Child Pornography Prevention Act of 1996, Pub.L. No. 104-208, 121, 110 Stat. 3009, 3009-26 to 3009-4 (codified as amended in 18 U.S.C. § 2251, 2252-2252A, 2256 and 42 U.S.C. § 2000aa); see also United States v. Sromalski, 318 F.3d 748, 751-52 (7th Cir.2003) (finding that § 2G2.2 and related guidelines should be interpreted in relation to the harms Congress identified when passing this Act). Section 2252A includes separate subsections prohibiting the distribution, sale, and possession of child pornography, with a further section prohibiting the distribution of child pornography to minors with the intent of inducing them to participate in illegal activities. See 18 U.S.C. § 2252A(a)(1)-(6). For purposes of punishment, § 2252A(b) distinguishes between possession and all other offenses, mandating a maximum sentence of 10 years for possession and a sentence between five and twenty years for all other offenses. See id. § 2252(b)(1)-(2).
The rationale underpinning the 1996 amendments, Congress said, was that the dissemination and production of child pornography differs from possession because active participation in the market for child exploitation encourages further exploitation of children to an even greater degree. See H.R.Rep. No. 104-863, at 28-29 (1996) (Conf.Rep.); see also United States v. Grosenheider, 200 F.3d 321, 332-33 (5th Cir.2000) (footnote omitted) (“It is clear that Congress established a series of distinctly separate offenses respecting child pornography, with higher sentences for offenses involving conduct more likely to be, or more directly, harmful to minors than the mere possession offense. Similarly, the guidelines clearly reflect consideration of whether and the degree to which harm to minors is or has been involved.”).
Congress further found that child pornography victimizes children not only at *527 the time of actual abuse but each time the image is accessed and distributed anew, since “its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years.” H.R.Rep. No. 104-863, at 28. By this metric, trafficking is qualitatively different from mere possession — and warrants heavier sanctions. It makes these images available to new viewers and keeps an image of exploitation in circulation, and thus may encourage the growth of a market leading to further exploitation. See New York v. Ferber, 458 U.S. 747, 756-59 & n. 10, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); United States v. Hoey, 508 F.3d 687, 692-93 (1st Cir.2007).
Second, the legislative history unequivocally shows that “trafficking” in child pornography means bartering these materials even when no financial stake is involved. In 1984, Congress expressly found that the child pornography market was dominated by collectors who bartered pornographic images to expand their collections and had little interest in trading for profit. See H.R.Rep. No. 98-536, at 16-17 (1984); see also United States v. Morales-De Jesús, 372 F.3d 6, 11 (1st Cir.2004) (explaining that Congress eliminated the commercial purpose requirement because of the prevalence of child pornography distributors who shared images with each other with no pecuniary motivation). Concerned that the Act was being under-enforced, Congress amended the statute specifically to ensure that it extended to these collectors. See Child Protection Act of 1984, Pub.L. No. 98-292, 98 Stat. 204 (codified as amended at 18 U.S.C. §§ 2251, 2252, 2253); see also H.R. Rep. 98-536 at 2 (1983), U.S.Code Cong. & Admin.News 1984, pp. 492, 493. Because “the harm to the child exists whether or not those who initiate or carry out the schemes are motivated by profit,” Congress deliberately broadened the scope of the Act to better serve its purpose. H.R. Rep. 98-536, at 2-3, U.S.Code Cong. & Admin.News 1984, at pp. 493-494.[6]
Based on this analysis, we conclude that the district court properly interpreted the trafficking cross-reference under § 2G2.4(c)(2) to include situations in which a defendant intended to exchange child pornography without any commercial purpose.
2. Meaning of “Intent” Under § 2G2.4(c)(2)
Before the district court, Dyer never used the term “specific intent” to set forth the legal requirements for applying § 2G2.4(c)(2), and has waived the argument. As a result, the district court did not directly comment on the meaning of the term “intent” as used in § 2G2.4(c)(2). It rather concluded that in light of the specific facts concerning Dyer’s use of Li-meWire, the intent requirement had been met. Dyer raises for the first time on appeal the argument that § 2G2.4(c)(2) requires evidence of specific intent, but only in passing and without any legal argument to support this assertion. This argument is twice waived on appeal. We accordingly review it for plain error. We find there was no error of law, and we reject a reading of § 2G2.4(c)(2) that would require specific intent to traffic in child pornography.
*528 This court recently emphasized the challenges in defining the term “intent” when it is used to denote an element of a crime. See United States v. Tobin, 552 F.3d 29, 32 (1st Cir.2009) (“ ‘Few areas of criminal law pose more difficulty than the proper definition of the mens rea required for any particular crime.’ ”) (emphasis original) (quoting United States v. Bailey, 444 U.S. 394, 403, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980)). In Tobin, we interpreted “intent” as used in a criminal statute prohibiting harassing phone calls by employing principles of statutory construction and looking to plain meaning, statutory structure, and legislative history. When these indicia were inconclusive, we turned to “general considerations,” namely the principle that for most crimes, “intent” ordinarily requires only that the defendant reasonably knew the proscribed result would occur (general intent), not that the defendant specifically intended such an outcome as his purpose (specific intent). Id. at 33 (citing Bailey, 444 U.S. at 404, 100 S.Ct. 624); see also United States v. Pitrone, 115 F.3d 1, 5 (1st Cir.1997) (observing and applying the rule that when the text of a criminal statute is indeterminate, courts should look to context, including purpose, legislative history, and “background legal principles,” to discern the kind of intent Congress had in mind).
We then reasoned that this principle that “intent” ordinarily means general intent would have less force in some situations where the consequences of the action are not necessarily wrong or harmful. Thus, when interpreting 47 U.S.C. § 223(a)(1)(D), which prohibits making repeated phone calls to the same number with an intent to harass, Tobin held that the government must prove the defendant specifically intended to harass the person at the called number because “[t]here is nothing inherently wicked or even suspect about multiple phone calls” absent the wicked intention motivating them. Id.
“Intent” has at least two possible ordinary meanings in the criminal context, referring either to the fact that a defendant purposefully and affirmatively desired an unlawful outcome or, alternatively, to a defendant’s reasonable knowledge that his acts might result in such an outcome. See Bailey, 444 U.S. at 403-04, 100 S.Ct. 624.
The texts of § 2G2.4 and § 2G2.2 are not explicit on what kind of scienter requirement the Commission intended. While § 2G2.2 pertains to trafficking and § 2G2.4 is predominantly concerned with possession, both guidelines penalize conduct that Congress has deemed inherently harmful. That the Guidelines enhance punishment for both actual trafficking and for intent to traffic suggests the Commission intended to enhance penalties for those whose actions support the market for child pornography and for those who should reasonably know that their conduct would do so. There is no indication that the Commission intended to depart from the ordinary meaning of the term “intent.” Further, there is every reason to think the Commission was, in this understanding of intent, carrying out congressional intent. Certainly, the Commission chose not to use alternate language which would have required specific intent.
The dissent incorrectly argues that the phrase “with intent to” is a term of art that mandates the conclusion that § 2G2.4(c)(2) requires proof that a defendant specifically intended to traffic in child pornography. That argument is undercut by Bailey, which noted that “the word ‘intent’ is quite ambiguous” when interpreting what the court of appeals had meant when using that precise phrase. 444 U.S. at 633, 100 S.Ct. 826. The use of the words “intent to traffic” does not by itself signify specific intent, as numerous *529 other courts have found in other contexts. For instance, 18 U.S.C. § 2320 punishes anyone who, inter alia, “intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services.” 18 U.S.C. § 2320(a)(1). Other circuits have held that specific intent was not required for culpability, on the grounds that specific intent requirements are not ordinarily prerequisites in criminal offenses and the legislative history did not support such an interpretation. See, e.g., United States v. Gantos, 817 F.2d 41, 42-43 (8th Cir.1987). Likewise, the Second Circuit has interpreted 18 U.S.C. § 479, which makes it a crime to “knowingly and with intent to defraud, utter[ ], pass[ ], or put off, in payment or negotiation, any false, forged, or counterfeited” foreign bonds, only as a general intent crime. See United States v. Mucciante, 21 F.3d 1228, 1235 (2d Cir.1994).[7]
Indeed, treating such language as per se imposing a specific intent requirement runs counter to the careful, context-specific weighing of text, structure, legislative history, and general considerations that we have long employed and is contrary to our analysis in Tobin.
The legislative history, in turn, supports a reading that intent in the sense of knowledge suffices. Congress described the evils of the child pornography market by focusing on the child victims involved, not by distinguishing between the motives of purveyors. Trafficking in child pornography has an equally horrific effect upon the children involved irrespective of whether the trafficker actively desires or merely knows that his actions will likely make images of child pornography more available to others. That Congress eliminated the requirement that traffickers in child pornography could only be prosecuted if they were acting with a commercial purpose underscores Congress’ understanding that such conduct is culpable regardless of the underlying motive. See H.R. Rep. 98-536, at 16-17, U.S.Code Cong. & Admin.News 1984, at pp. 507-508.
We also turn to the “general considerations” explained in Tobin. These considerations strongly confirm that § 2G2.4(c)(2) does not require specific, purposeful intent. We should instead rest upon the default assumption discussed in Bailey and elsewhere that an intent to traffic in child pornography, like most other crimes, requires only general intent. Unlike the repeated phone calls at issue in Tobin, sharing child pornography qualifies as inherently bad conduct. Indeed, Tobin itself makes this exact distinction. Another subsection of the statute at issue in Tobin prohibited making phone calls if those calls involved content that could be considered child pornography, with the intent to harass another person. Tobin stated that this subsection “involve[d] suspicious or even malign conduct” and concluded that unlike the provision at issue, “intent” in this subsection meant only “mere knowledge of consequences.” Tobin, 552 F.3d at 33.[8]
*530 Further, courts are ordinarily concerned with the distinction between specific and general intent when defining elements of a crime in order to put defendants on notice of where the line between culpable and innocent conduct falls. See, e.g., Carter v. United States, 530 U.S. 255, 268-69, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). No such concern applies at sentencing. Courts routinely interpret the Sentencing Guidelines by looking at related conduct beyond the specific elements of a criminal offense, because the purpose is to assess the severity of the defendant’s particular crime in light of the surrounding circumstances. See Witte v. United States, 515 U.S. 389, 402-03, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995). In so doing, courts are not punishing a defendant for a distinct offense; they are instead evaluating the totality of a defendant’s conduct in order to arrive at a reasonable sentence. See United States v. Amirault, 224 F.3d 9, 15 (1st Cir.2000) (holding that a sentencing court can look to past, uncharged conduct to impose an aggravated sentence for the possession of child pornography because such conduct bears upon the gravity of the possession offense).
We therefore reject the defendant’s argument that the government must necessarily show the defendant actively and subjectively desired that others would get images of child pornography from him and that ordinary general intent does not suffice.
B. Application of “Intent to Traffic” in This Case
We consider the district court’s application of this guideline to the facts of this case to be a mixed question of law and fact, which we review using a sliding standard of review. We review predominantly legal questions de novo, while we defer to fact-driven determinations and review them for clear error. See United States v. Sicher, 576 F.3d 64, 70-71 & n. 6 (1st Cir.2009). The district court’s application of § 2G2.4(c)(2) in this case was heavily fact-dependent, and we find that it did not err in concluding that Dyer’s online conduct showed an “intent to traffic” under § 2G2.4(c)(2). We would reach this conclusion even if we were to review the district court’s application of § 2G2.4(c)(2) de novo.
The Internet, and its capacity to facilitate online bartering of computer files between collectors and purveyors of child pornography, readily links a single computer user to a possible network of others. See United States v. Lewis, 554 F.3d 208, 210 (1st Cir.2009). It is clear that for there to be any meaningful distinction between the crimes of possession and the enhancement for intent to traffic, more than mere receipt of child pornography on a computer must be shown for § 2G2.4(c)(2) to apply. Sromalski, 318 F.3d at 751-52. Other circuits have held that this cross-reference applies to defendants who arranged to exchange images of child pornography with others over e-mail or by posting these images in an online chatroom. See, e.g., United States v. Bender, 290 F.3d 1279, 1285 (11th Cir.2002) (applying cross-reference to defendant who traded child pornography over email); United States v. Johnson, 221 F.3d 83, 98 (2d Cir.2000), cert denied, 533 U.S. 953, 121 S.Ct. 2599, 150 L.Ed.2d 757 (2001) (applying 2G2.4(c)(2) to defendant who conceded that he “sen[t] and received” images of child pornography on his computer).
*531 We do not decide whether the use of file-sharing software such as LimeWire per se would have qualified as trafficking under § 2G2.4(c)(2). Our holding centers on the facts of this case. As the sentencing judge emphasized, Dyer chose to download and frequently use LimeWire, a type of peer-to-peer software that creates a shared system of users, and he did so to acquire images of child pornography for his personal collection.[9] He downloaded these files into a “shared” folder that he knew would be made available to others. He did so for two years and gave no indication to Agents Lechner and Pritch-ard that he would have stopped had he not been arrested. He knew how to turn off the “sharing” feature of LimeWire and prevent other users from accessing these features, but he did not, at any point, make an effort to do so. By his actions, Dyer took deliberate steps to become part of a virtual community of consumers of child pornography who shared images to enlarge their own collections. Our holding that these acts showed an “intent to traffic” likewise comports with the holdings of other circuits on similar fact patterns. See United States v. Groenendal, 557 F.3d 419, 423-24 (6th Cir.2009) (holding that the defendant engaged in trafficking under § 2G2.4(c)(2) when he posted images online to child pornography-trading group); Todd, 100 Fed.Appx. at 250 (finding that “[b]y downloading the images and making them accessible to others,” defendant became eligible for sentencing pursuant to § 2G2.4(c)(2)).[10]
To be clear, we do not today reach the abstract issue of whether any LimeWire user who downloaded child pornography could have been sentenced under § 2G2.4(e)(2) because of LimeWire’s inherent file-sharing features and purposes. Dyer, by his own admission, was differently situated from an unwitting LimeWire user who failed to realize that by downloading files, he was also saving them to a “shared,” universally accessible folder on his own computer. On the facts of this case, the district court was correct to conclude that Dyer’s conduct warranted the application of § 2G2.4(c)(2).
III.
Finally, Dyer asserts that the district court relied upon Agent Lechner’s testimony before a grand jury to conclude that Dyer knew that he could have made child pornography files unavailable to other Li-meWire users by transferring the files to another location. This, Dyer claims, violated his Confrontation Clause rights because the grand jury testimony was never part of the record and because he had no chance to challenge that testimony during the sentencing hearing.
*532 This argument lacks merit, not least because the Confrontation Clause does not apply at sentencing. See United States v. Luciano, 414 F.3d 174, 178-79 (1st Cir.2005).
Further, Dyer failed to raise this argument before the district court, and any claim would therefore have to rise to the level of plain error to warrant reversal. See United States v. Antonakopoulos, 399 F.3d 68, 77 (1st Cir.2005). There is no possibility of plain error in this case. Dyer presents no evidence that the district court relied upon Lechner’s grand jury testimony. Moreover, Dyer’s counsel effectively cross-examined Agent Lechner about Dyer’s understanding of file-sharing at the sentencing hearing. Beyond this, the district court’s conclusion that Dyer knew he could have disabled the sharing feature is supported by a number of documents throughout the record, including the government’s Exhibit A at sentencing. That exhibit, in fact, explicitly summarized Agent Lechner’s conclusion from his interview with Dyer that Dyer knew “you would have to physically move the file to another location to make it unavailable for sharing.”
The sentence is affirmed.

. The government also charged Dyer with transportation of child pornography but ultimately asked the trial judge to dismiss this count.

. Specifically, the PSR calculated a two-level enhancement for materials involving a prepubescent minor, another two-level enhancement for possession involving the use of a computer, a four-level enhancement for possession of images involving sadism and masochism, and a five-level enhancement for possession of over 600 images. The PSR also adjusted for Dyer’s acceptance of responsibility, resulting in a final offense level of 25.

. Dyer also contested the recommended enhancements for possession of sadistic images and for possession of more than 600 images. He does not, however, challenge these enhancements, which the court applied, on appeal.

. Subsequent amendments to the Guidelines consolidated these offenses into a single subsection, with provisions for sentencing enhancements and reductions depending upon the extent to which a defendant's conduct went beyond mere possession. See U.S.S.G. § 2G2.2 (2004) (Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, Soliciting, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic; Possessing Material Involving the Sexual Exploitation of a Minor).

. While Jordan was an unpublished Second Circuit opinion, we. consider it to be persuasive authority since it squarely addressed the same argument made by the defendant in the present appeal. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 314 F.Supp.2d 201, 203 n. 1 (S.D.N.Y.2003) (treating Second Circuit unpublished opinions "at least" equivalent in authority to law review notes).

. As we observed in Morales-De Jesús, we consider the legislative history and the congressional findings of prior iterations of the Act relevant to its present meaning, since “when Congress previously passed related legislation accompanied by applicable findings, subsequent legislation was 'presumably based on similar findings and purposes with respect to the areas newly covered.' ” 372 F.3d at 10 n. 2 (quoting Maryland v. Wirtz, 392 U.S. 183, 190 n. 13, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968)).

. One circuit has also held that 18 U.S.C. § 115(a)(1)(B), which prohibits threats of assault, kidnaping, or murder against federal officials, judges, and law enforcement officers "with intent to” inhibit their official duties or "with intent to” retaliate against them, is a general or specific intent crime. See United States v. Ettinger, 344 F.3d 1149, 1156 (11th Cir.2003); but see United States v. Veach, 455 F.3d 628, 631-32 (6th Cir.2006) (requiring specific intent); United States v. Stewart, 420 F.3d 1007, 1017 (9th Cir.2005) (same).

. While we have recognized that the crime of possession of a controlled substance with intent to distribute requires proof that the defendant specifically and purposefully intended to traffic in drugs, that conclusion resulted from statutory language that includes the phrase "knowingly or intentionally” and by *530 concerns with overbreadth. See, e.g., United States v. Hassan, 542 F.3d 968, 979 (2d Cir.2008); United States v. Caseer, 399 F.3d 828, 839 (6th Cir.2005). Both of those concerns are inapplicable in the present context.

. We have previously discussed LimeWire's functions at length. LimeWire "is a peer-to-peer file sharing application that connects users who wish to share data files with one another.” Lewis, 554 F.3d at 211. When a user downloads LimeWire, the program creates a new folder on his computer where any files downloaded from LimeWire will be saved. LimeWire designates this as a "shared” folder, meaning that its contents will automatically be available to other users. Users can locate and download these files free of charge by entering search terms describing the desired content. When a user downloads a copy of the file, LimeWire saves it in the user’s "shared” folder. Id. at 211.

. Moreover, these facts would be sufficient for us to find an intent to traffic even if § 2G2.4(c)(2) were read to require specific intent. Dyer’s long-term, purposeful use of LimeWire, his deliberate failure to turn off the file-sharing function, and his awareness that other users could download child pornography from his "shared” folder could reasonably be found to amount to a specific intent to share these images with other users, not just knowledge that such a result was the likely consequence of his actions.